## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEANNA PIERCE, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 17-05539 |
| CITY OF PHILADELPHIA, | |
| *Defendant.* | |

**PAPPERT, J.**                                                                 **December 28, 2018**

### MEMORANDUM

Deanna Pierce is a Native American woman who has worked in the City of Philadelphia's Department of Prisons ("PDP") since 2002. This litigation emanates from the City's promotion of two PDP employees—one Latina and one African American—over Pierce for separate positions in the PDP. Pierce believes the PDP promoted the other employees in an effort to satisfy the City's goal of building a diverse municipal workforce that "looks like the City of Philadelphia." She claims the City discriminated against her on the basis of race, harassed her and retaliated against her for complaining of unlawful discrimination. Pierce seeks summary judgment on her discrimination claim with respect to one of the positions while the City moves for judgment in its favor on all claims. After thoroughly reviewing the record and holding oral argument, the Court denies Pierce's Motion and grants in part and denies in part the Motion filed by the City.

I

A

Deanna Pierce began working in the PDP as a social worker II on March 4, 2002. (Def.'s Stmt. of Facts ("Def.'s SMF"), ECF No. 35, at ¶ 2.) She was promoted to social work supervisor on February 6, 2006. (*Id.* at ¶ 3.) On July 6, 2011, she resigned from the PDP to care for her mother; she returned to the PDP as a social work supervisor on July 6, 2012. (*Id.* at ¶¶ 4–5; Pl.'s Am. Resp. Def.'s Stmt. of Facts ("Pl.'s Resp. Def.'s SMF"), ECF No. 51, at ¶ 4.) Pierce obtained a certification in correctional supervision from the American Correctional Association in 2013. (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. Supp.") Ex. A ("Pierce Dep."), at 20:2–20; Def.'s SMF, ECF No. 35, at ¶ 80.) She is a level II hostage negotiator at the PDP and a PDP facility representative for the Correctional Peace Officer Foundation. (Def.'s SMF, ECF No. 35, at ¶¶ 81–82.)

The PDP's written policy regarding race discrimination is contained in Section 1.C.8 of the Philadelphia Prisons Policies and Procedures. (Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem. Opp'n") Ex. Y, ECF No. 41.) This policy, entitled the Equal Employment Opportunity/Sexual Harassment/ Discrimination ("EEO") policy, "ensure[s] that all qualified persons have an equal opportunity for access to employment, employment benefits, and other career and promotional activity" and prohibits discrimination "against any person employed or seeking employment because of . . . race." (*Id.*) The policy extends to any employment decision, including promotion, "based on one's membership in a protected category." (*Id.*) In addition, "[u]nlawful harassment based on one's membership in any . . . protected class," including "verbal or physical conduct based on race . . . when such conduct has the purpose or effect of: (i)

unreasonably interfering with an individual's work performance, or (ii) creating an intimidating, hostile, or offensive work environment" is prohibited, as is retaliation against those who complain of employment discrimination in good faith." (*Id.*)

In addition to the EEO policy, the City's current Administration has a stated goal of a racially diverse municipal workforce that reflects the demographics of the City's population. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Mem. Opp'n") Ex. K, ECF No. 40; Def.'s Mem. Opp'n Ex. X.) Specifically, Mayor James Kenney, who came into office in January of 2016, made it a "key priority" to build a City workforce that "looks like the City of Philadelphia."[1] (Def.'s SMF, ECF No. 41, at ¶ 26; Def.'s Mem. Opp'n Ex. X.) Kenney appointed Blanche Carney to be the first female African American Commissioner of the PDP in April of 2016. (Def.'s SMF, ECF No. 41, at ¶ 32.) Carney testified that she understands the City of Philadelphia, including the PDP, to have a policy of creating a municipal workforce that reflects the racial demographics of the City, and that Mayor Kenney instructed her to implement this policy in the PDP.[2]

---

[1]    The parties refer to the Mayor's priority as the "Diversity Initiative." *See, e.g.*, (Hr'g Tr., ECF No. 54, at 66:4–11.)

[2]    The record shows that the Mayor's Office kept track of how City Departments' personnel reflected the City's racial demographics. The Mayor's Philadelphia Workplace Profile Report, reflecting data as of November 6, 2016, stated Mayor Kenney's goal "to create a government workforce that looks more like the population of the City" and compared the demographics of the City population with workforce demographics. (Pl.'s Mem. Opp'n Ex. M.) The 2017 Philadelphia Workplace Diversity Profile Report, reflecting data as of June 30, 2017, analyzed City demographics and found "more White Philadelphians and African Americans represented in the . . . workforce than the actual population" and that "[t]he number of Hispanic and Asian employees in the workforce is lower than the Philadelphia population." (Def.'s Mem. Opp'n Ex. X.) On July 17, 2017, the Mayor's Chief of Staff, Jane Slusser, emailed Carney a Diversity and Inclusion Report tailored to the PDP and a Hiring & Attrition Report Guide containing the demographic breakdown for the City population—"44% Black or African American; 35% White; 14% Hispanic or Latino . . ."—and commented that the PDP "lacks representation of one or more major Philadelphia demographic groups within its exempt workforce." (Pl.'s Mem. Opp'n Ex. K.)

(Def.'s Mem. Supp. Ex. N ("Carney Dep."), ECF No. 34, at 38:10–15, 39:19–24.)  The Diversity Initiative extends to executive-level employees.  (*Id.* at 119:11–15.)

Similarly, PDP Human Resources Manager Tracy Delaney believes that the City has a policy, which "came along with" the Kenney administration, of promoting and retaining diverse employees.  (Def.'s Mem. Supp. Ex. G ("Delaney Dep."), ECF No. 34, at 12:16–19, 35:6–24.)  Delaney testified that the only way the PDP could achieve the City's goal to build a workforce that reflects Philadelphia's racial demographics is to consider race in hiring decisions.  (*Id.* at 29:22–31:1.)  While Delaney herself believes that the City's "policy of considering race in personnel decisions" is discriminatory and violates the PDP's EEO policy, she testified that to the best of her knowledge, the PDP has not made any hiring decisions based on race.  (*Id.* at 30:6–9, 40:17–21, 41:10–42:8, 115:8–11.)  One of the PDP's Deputy Commissioners, Robert Tomaszewski, also testified that he believes since Mayor Kenney took office, there has been an unwritten policy at the PDP that race is taken into consideration in hiring decisions.  (Def.'s Mem. Supp. Ex. C ("Tomaszewski Dep."), ECF No. 34, at 57:8–13, 70:2–9.)[3]

B

i

When Carney became Commissioner, the percentage of Hispanics employed by the PDP at the executive level did not reflect the percentage of Hispanics living in the City.  (Pl.'s SMF, ECF No. 32, at ¶ 35.)  On March 18, 2016, Philadelphia

---

[3]     Tomaszewski interviewed for the Commissioner position but Carney was chosen. Tomaszewski thereafter sued the City alleging race and sex discrimination, harassment and retaliation.  (Def.'s SMF, ECF No. 35, at ¶ 34.)  *See Tomaszewski v. City of Phila.*, No. 17-cv-4675 (E.D. Pa. Oct. 17, 2017).

Councilwoman Maria Quiñones-Sanchez emailed Brian Abernathy, the City's First

Deputy Managing Director and Carney's direct supervisor:

> Brian, as you finalize the selection of the Prison Commissioner, I wanted to
> bring your attention to a highly qualified Latina in the system. We have
> no high ranking Latino in the Prisons. . . . When I spoke with Mayor
> Kenney yesterday, we discussed how we really need to try to get his Latino
> appointments up. This may work.

(Pl.'s SMF, ECF No. 32, at ¶¶ 37, 39.) Quiñones-Sanchez attached to the email the

resume of Jennifer Albandoz, a social work supervisor at the PDP. (*Id.* at ¶ 37.)

Albandoz had begun her career at the PDP in 1996 as a correctional officer. (Def.'s

SMF, ECF No. 35, at ¶ 42.) She became a social worker in 2008 and was promoted to

social work supervisor in 2011. (*Id.* at ¶ 43.) On April 1, 2016, Abernathy forwarded

Quiñones-Sanchez's email to Carney, stating, "Wanted this on your radar." (*Id.* at

¶ 40.) Carney responded, "Thanks and I have supervised Mrs. Albandoz." (Pl.'s Mem.

Opp'n Ex. N.) Carney did not have any further conversations with Abernathy about

Quiñones-Sanchez's recommendation. (Def.'s Mem. Opp'n Ex. Z ("Second Carney

Dep."), ECF No. 41, at 28:24–29:7.) Abernathy testified that he thought he called

Quiñones-Sanchez to tell her he would "take her issue under advisement," but he "made

no commitment to the position or to her desire." (Def.'s Mem. Supp. Ex. AA

("Abernathy Dep."), ECF No. 41, at 10:17–11:8.)

On April 16, 2016, one of former Mayor Rendell's employees, Rafaela Colon, sent

Abernathy an email with a letter attached which stated:

> It has come to my attention that for several years now, the [PDP] has lacked
> Latino representation . . . At this time, I am challenging the new city
> administration and its department to utilize their position in city
> government to impact real change in diversity by appointing a qualified,
> competent, and experienced Latino to the position of Deputy Commissioner
> for Restorative and Transitional Services. Furthermore, I strongly urge

> you and those in the respective departments to consider Ms. Jennifer
> Albandoz for the position. . . . Once Ms. Albandoz is appointed to this
> prestigious position, the City of Philadelphia can really boast about its
> diversity in appointing the first African-American woman as Commissioner
> and the first Latino woman as the Deputy Commissioner of the [PDP].

(Pl.'s SMF, ECF No. 32, at ¶ 41.) On April 17, 2016, Abernathy forwarded the email

and letter to Carney and asked her to send him a list of the highest-ranking Latino

PDP employees. (Pl.'s Mem. Opp'n Ex. Q.) Delaney prepared a list, which Carney sent

back to Abernathy on April 18, 2016. (Pl.'s Mem. Opp'n Exs. R–S.) Later on April 18,

Abernathy drafted a response to Colon's letter and sent the draft to Carney for her

review. (Abernathy Dep. 24:8–15; Pl.'s Mem. Opp'n Ex. T.) In the proposed response,

which he eventually sent to Colon, Abernathy stated, "we will do what we can to

promote Latinos within the confines of civil service regulations." (Pl.'s Mem. Opp'n Ex.

T.) Despite Colon's letter, Albandoz was not appointed Deputy Commissioner for

Restorative and Transitional Services. (Hr'g Tr., ECF No. 54, at 21:7–10.)

ii

As a social work supervisor, Deanna Pierce reported directly to a Human

Services Program Administrator ("HSPA"). (Pl.'s SMF, ECF No. 32, at ¶ 7.) There are

two HSPAs in the PDP; both are civil service positions and considered executive staff.

(Pierce Dep. 34:21–24; Pl.'s SMF, ECF No. 32, at ¶ 8; Def.'s SMF, ECF No. 41, at ¶ 6.)

To apply for a promotion to a civil service position, PDP Policies and Procedures require

employees to take a civil service examination. Under the "civil service rule of two," if

there is one vacancy for a civil service position, the PDP must interview the two people

with the highest exam scores who are interested in the position. (Def.'s SMF, ECF No.

35, at ¶ 20.)  The Commissioner has final decision-making authority with respect to hiring and promotions in the PDP.  (Def.'s SMF, ECF No. 41, at ¶ 33.)

Pierce, along with three other PDP employees, took written and oral civil service examinations for the HSPA position on October 30 and November 14, 2014, respectively.  (Pl.'s SMF, ECF No. 32, at ¶ 6; Def.'s SMF, ECF No. 41, at ¶ 12.) Adrienne Lyde (African American) scored 102.808 on the exam, Pierce scored 97.325, Dawn Hall (African American) scored 95.933 and Jennifer Albandoz scored 94.693. (Def.'s SMF, ECF No. 35, at ¶¶ 16–19.)  Pursuant to the "rule of two," the PDP interviewed Lyde and Pierce for an open HSPA position in February of 2015, and Lyde received the promotion.[4]  (Def.'s SMF, ECF No. 41, at ¶¶ 21, 25; Second Carney Dep. 76:4; Carney Dep. 209:2–8.)

In May of 2016, former Administrator Terrell Bagby was appointed Deputy Commissioner.  (Pl.'s SMF, ECF No. 32, at ¶ 13; Def.'s SMF, ECF No. 35, at ¶ 35.) Pierce and her colleagues, including Hall and Albandoz, met to discuss who would interview for the newly vacant HSPA position.  (Def.'s SMF, ECF No. 41, at ¶¶ 79–80.) Hall decided not to pursue the job, so the PDP interviewed Pierce and Albandoz, the next two highest scorers on the civil service exam.  (*Id.* at ¶¶ 82, 87; Pl.'s SMF, ECF No. 32, at ¶¶ 15–16.)

Both women were interviewed on June 24, 2016 by a panel of PDP staff members consisting of Commissioner Carney, former Acting Commissioner Michael Resnick, Deputy Commissioners Karen Bryant and Terrell Bagby and Human Resources Manager Tracy Delaney.  (Def.'s SMF, ECF No. 41, at ¶ 87; Def.'s SMF, ECF No. 35, at

---

[4]      Pierce initially claimed in this lawsuit that the City discriminated against her by promoting Lyde.  Pierce voluntarily withdrew this claim on November 1, 2018.  *See* (ECF No. 33).

¶ 45; Pl.'s Resp. Def.'s SMF, ECF No. 51, at ¶ 45.)  Immediately following each interview, the panelists recorded their impressions of the candidate on written forms. (Def.'s Mem. Supp. Ex. I ("Bagby Dep."), at 66:15–21.)  The forms required each panelist to rate the interviewee as acceptable, questionable or unacceptable.  (Pl.'s Mem. Opp'n Ex. ZZ.)  Each panelist rated Albandoz and Pierce the same way—either acceptable or questionable—except Bryant, who did not rate Albandoz.  (*Id.*)  Carney wrote on the forms that Pierce had good ideas regarding performance management but answered questions partially, while Albandoz discussed measurements, goals and providing services to clients but would need to rely less on her supervisor when making decisions. (*Id.*)  Resnick wrote that Pierce gave "superficial responses" and had trouble focusing, while Albandoz seemed to rely on her supervisors too heavily and did not seem to have a vision for the future.  (*Id.*)  Bryant wrote that Pierce "pushed through the interview" and expressed her ideas despite her illness—on the day of the interview, Pierce was suffering from diarrhea, (Pierce Dep. 63:19)—and Albandoz spoke clearly and seemed willing to learn.  (*Id.*)  Bagby felt that Pierce was "usually articulant [sic] and well organized in the workplace" and appeared motivated, but she did not present well in the interview and had moments of loss of thought.  (*Id.*)  Bagby wrote that Albandoz was clear and appeared motivated but gave a generic example of her problem-solving skills.  (*Id.*)  Delaney wrote that Pierce mentioned policy and statistics and Albandoz interviewed well but did not give straightforward answers to the panelists' questions. (*Id.*)

The panelists offer conflicting testimony as to whether they met after the interviews to discuss the candidates' performances and whether they recommended to

Carney who should receive the promotion. *Compare* (Carney Dep. 199:2–11; Def.'s Mem. Supp. Ex. O ("Bryant Dep."), ECF No. 34, at 49:6–12; Delaney Dep. 59:10–15; Def.'s Mem. Supp. Ex. J ("Resnick Dep."), ECF No. 34, at 87:20–22), *with* (Bagby Dep. 89:10–19). Carney testified that the panelists all recommended Albandoz, and Resnick testified that he thought the consensus among the panelists was that Albandoz performed better during her interview. (Carney Dep. 200:3–6; Resnick Dep. 86:20–22.) Bryant and Bagby testified that they did not recommend one candidate over the other; Delaney testified that she could not remember which candidate she recommended or whether there was a preference among the panelists for one candidate over the other. (Bryant Dep. 51:3–7; Bagby Dep. 89:10–19; Delaney Dep. 59:15, 63:18.) Ultimately, Carney promoted Albandoz to the HSPA position. (Pl.'s SMF, ECF No. 32, at ¶ 18.) Delaney informed Albandoz of Carney's decision on July 5, 2016. (Pl.'s Mem. Opp'n Ex. J.)

C

In August or September of 2016, Pierce met with Deputy Commissioner Tomaszewski for lunch, along with mutual friend and co-worker Francine McCann. (Pierce Dep. 45:8–46:7.) Tomaszewski agreed to meet with Pierce because he believed Albandoz was promoted to the HSPA position "due to [her] national origin." (Tomaszewski Dep. 123:11–12.) During lunch, Tomaszewski told Pierce that the City had been looking for a Hispanic person to fill the HSPA position and that someone had been pushing Carney to hire a Hispanic. (Def.'s SMF, ECF No. 35, at ¶¶ 85–87.) Pierce filed a charge of discrimination with the EEOC against the City and cross-filed with the Pennsylvania Human Relations Commission on October 3, 2016. (*Id.* at ¶ 91.) She sent

a copy of the charge to Albandoz, who was now Pierce's direct supervisor. (Def.'s Mem. Supp. Ex. M ("Albandoz Dep."), ECF No. 34, at 93:8–16, 101:6–102:8.) Pierce testified that after she filed the EEOC charge, Albandoz treated her more "dismissively" than other social work supervisors in the PDP. (Pl.'s SMF, ECF No. 40, at ¶ 76.) She believes Albandoz meets with other supervisors regularly but does not offer the same support to Pierce. (*Id.* at ¶ 77.) She also believes Albandoz deprived her social work unit of staff members and clerical support personnel, while other supervisors' teams are fully staffed. (Pl.'s Mem. Opp'n Ex. DD ¶¶ 3–4.) She testified that her social work unit did not have clerical support for over a year, and there are still vacant social worker positions in her unit. (Pierce Dep. 121:19–21; 171:10–24.) Consequently, Pierce has asked Albandoz for overtime pay five to ten times, and Albandoz has either denied or ignored the requests. (*Id.* at 131:1–13.) At least once, however, on April 12, 2017, Albandoz did approve one of Pierce's overtime requests. (*Id.* at 139:18–20, 142:2–4.)

Pierce also believes Albandoz denied her a lunch break at least three times. (Pl.'s SMF, ECF No. 40, at ¶ 84.) On January 9, 2017, April 20, 2017 and July 17, 2017, Pierce told Albandoz via email or text message that she intended to use her sick or FMLA time to leave work for two to three hours after lunch. (Pl.'s Mem. Opp'n Ex. EE.) Each time, Pierce left work at the beginning of her lunch hour and asked Albandoz to begin tracking her sick or FMLA time one hour later, even though Pierce did not plan to return to work after lunch. (*Id.*; Pl.'s SMF, ECF No. 40, at ¶ 84.) Each time, Albandoz required Pierce to sign out of work after her lunch hour to mark the beginning of her sick or FMLA time. (Pl.'s Mem. Opp'n Ex. EE.) Pierce testified that Albandoz's unwillingness to account for the lunch hour differed from Pierce's former

supervisors, who would regularly account for the lunch hour in like circumstances. (Pierce Dep. 167:18–168:12.)

On May 22, 2017, Albandoz issued Pierce an Employee Violation Report ("EVR"). (Def.'s SMF, ECF No. 35, at ¶ 92.) An EVR is "formal communication" that is "punitive in nature and should be used in situations where a Written Warning is not considered to be suitable, or in situations where [the employee] has already received a Written Warning in the past." (Pl.'s SMF, ECF No. 40, at ¶ 86.) Albandoz issued the EVR because Pierce allegedly left her post without permission in order to give a site tour to her union's health and safety committee. (Def.'s SMF, ECF No. 35, at ¶ 92; Pierce Dep. 204:17–205:11.) Pierce appealed the EVR, and the PDP held a preliminary and then formal board hearing regarding the allegation. (Def.'s SMF, ECF No. 35, at ¶ 95; Pl.'s SMF, ECF No. 40, at ¶ 91.) The board found the EVR unsubstantiated and dismissed the violation. (Def.'s SMF, ECF No. 35, at ¶ 96.) Pierce filed a second charge of discrimination with the EEOC and cross-filed with the Pennsylvania Human Relations Commission on June 9, 2017. (*Id.* at ¶ 106.)

In July of 2017, Pierce complained that she had not received credit for her lunch hour on July 17, 2017 when she left work early. (Pl.'s Mem. Opp'n Ex. EE.) Delaney sent Pierce an email stating "the PDP does not have a policy to support 'lunching out.'" (*Id.*) On July 25, 2017, Pierce responded to Delaney, stating that she believed Albandoz's treatment of her "is continued harassment and retaliation." (*Id.*)

D

On July 7, 2017, the City announced it was looking to fill the Community Justice and Outreach ("CJO") Director position in the PDP, which is not a civil service position.

(Def.'s SMF, ECF No. 35, at ¶ 107.)  The announcement listed the position's prerequisites, including three years of experience as a social work supervisor.  (*Id.* at ¶ 109.)  Three candidates applied: Leroy Pendleton (African American), Kenneth James (African American) and Diana Tomlin.[5]  (*Id.* at ¶¶ 110–12.)  Pierce did not apply for the position because she was not sure she wanted to be the CJO Director and she "was still feeling pretty angry [about] not getting the HSPA position."  (Pierce Dep. 94:21–23.)  Although the CJO Director job would not have included a pay raise for Pierce, it would still have been "seen as a promotion."  (*Id.* at 95:21–96:1.)  Later in July of 2017, Tomlin decided not to interview for the position, James was found unacceptable due to his poor interview performance and Pendleton, who had only two years of experience as a social work supervisor, did not meet the job requirements.  (Def.'s SMF, ECF No. 35, at ¶¶ 112, 114–15.)

On August 1, 2017, the City amended the prerequisites for the position to require only two years of social work supervisor experience.  (*Id.* at ¶¶ 118–19.)  This time, only Pendleton and Pierce applied.  (*Id.* at ¶ 121.)  The interview panel consisted of Commissioner Carney, Human Resources Associate Corin Chapman, Chief of Staff Greg Vrato and former CJO Director Yolanda Lockwood.  (*Id.* at ¶ 123.)  Immediately following each interview, the panelists recorded their impressions of the candidates on written forms.  (Def.'s Mem. Supp. Ex. V ("Vrato Dep."), ECF No. 34, at 114:6–7.)  The panelists all marked Pierce and Pendleton "acceptable" for the position.  (Pl.'s Mem. Opp'n Ex. JJ.)  Carney wrote that Pierce would seek the Commissioner's assistance if she had trouble receiving information from a facility, whereas Pendleton would follow

---

[5] The record does not identify Ms. Tomlin's race.

up with the facility in those circumstances. (*Id.*) Chapman wrote that Pierce indicated she is not good at public speaking, "which is a job requirement," and mentioned leaning on the Commissioner, "which in the [CJO Director] position, is not good." (*Id.*) Chapman wrote that Pendleton was nervous and had to be redirected but "seem[ed] like a great candidate" who would be able to work independently. (*Id.*) Vrato noted that Pierce was articulate, gave detailed responses, was experienced and motivated but stated she was not comfortable with public speaking; he wrote that Pendleton was articulate, motivated and professional and would be effective in the position. (*Id.*) Lockwood felt that Pierce seemed to have time management skills, appeared organized and stated she would seek direction from her supervisor, and Pendleton would have to learn "the process" but appeared willing to seek direction. (*Id.*)

The panelists met to discuss the candidates' performance after the interviews. *See* (Carney Dep. 359:21–23; Def.'s Mem. Supp. Ex. K ("Chapman Dep."), ECF No. 34, at 36:16–18; Def.'s Mem. Supp. Ex. S ("Lockwood Dep."), ECF No. 34, at 41:15–17, 42:1–2, 54:21; Vrato Dep. 115:12–17, 122:24). Carney testified that she thought the panelists recommended Pendleton. (Carney Dep. 364:8–10, 364:17–365:13, 366:8–10.) Chapman testified that every panelist recommended Pendleton. (Chapman Dep. 39:15, 46:5–8.) Vrato testified that he recommended Pendleton. (Vrato Dep. 123:5–6.) Lockwood testified that she recommended Pierce. (Lockwood Dep. 61:5.) Ultimately, Carney appointed Pendleton to the CJO Director position on August 18, 2017. (Def.'s SMF, ECF No. 35, at ¶¶ 154–55; Pl.'s SMF, ECF No. 40, at ¶ 110.)

E

On August 31, 2017, Pierce asked to speak with Deputy Commissioner Bagby regarding the discrimination, harassment and retaliation she believed she was experiencing. (Pierce Dep. 198:6–10.) According to Pierce, Bagby refused to speak with her and told her to speak instead with Albandoz. (*Id.* at 198:13–18.) Shortly afterwards, Pierce had an "altercation" with Albandoz in Albandoz's office. (*Id.* at 198:15–20.) Albandoz asked Pierce to obtain a social worker's signature on an EVR because the social worker's supervisor was out of the office. (*Id.* at 201:2–12.) When Pierce returned to Albandoz with the signed EVR, Albandoz "started yelling and screaming" at Pierce because she had not required the employee to sign the EVR in the presence of a union representative. (*Id.* at 201:21–24.) Pierce told Albandoz that she intended to report Albandoz's harassing behavior to the PDP's Office of Professional Conduct ("OPC"). (*Id.* at 203:18–24.) Albandoz responded, "Go on with your show . . . Get out of my face." (*Id.* at 203:10–11; Pl.'s Mem. Opp'n Ex. NN.)

Pierce reported the altercation to the OPC on September 5, 2017 and filed a third charge of discrimination with the EEOC and cross-filed with the Pennsylvania Human Relations Commission on September 12, 2017. (Pl.'s Mem. Opp'n Ex. NN; Def.'s SMF, ECF No. 35, at ¶ 163.) When the OPC investigated Pierce's complaint, Pierce asked to be removed from Albandoz's supervision. (Pl.'s Mem. Opp'n Ex. OO.) Specifically, Pierce asked that Albandoz be transferred out of the Philadelphia Industrial Correctional Center ("PICC") where Pierce and Albandoz both worked so that Pierce could remain there. (*Id.*) The OPC did not transfer Albandoz. (Vrato Dep. 143:1–144:2.)

In the fall of 2017, Pierce asked to attend the American Correctional Association conference to obtain credits for her correctional supervision certification. (Pl.'s SMF, ECF No. 40, at ¶¶ 139–41.) On November 30, 2017, the City denied Pierce's request. (*Id.*) Albandoz instructed her to instead look for training opportunities in the tri-state area. (Def.'s SMF, ECF No. 35, at ¶ 178.) In the spring of 2018, the City denied Pierce's requests to attend the Correctional Peace Officer Foundation and American Jails Association conferences. (Pl.'s SMF, ECF No. 40, at ¶ 156.) The PDP also denied other staff members' requests to attend the POF conference. (Def.'s SMF, ECF No. 35, at ¶ 180.) Pierce had never attended the AJA conference before. (*Id.* at ¶ 179.)

On January 31, 2018, Pierce sent a memo to Albandoz and Pamela Robinson, the president of her union, stating that she "continue[s] to feel as though HSPA Albandoz is harassing [her] and creating a hostile work environment for [her]." (Pl.'s Mem. Opp'n Ex. UU.) On February 20, Pierce filed another complaint with the OPC and again requested to be removed from Albandoz's supervision. (Pl.'s SMF, ECF No. 40, at ¶ 149.) The OPC denied her request on March 22, 2018, stating that removing Albandoz from the PICC would cause undue hardship. (*Id.* at ¶ 155.)

On February 27, 2018, Albandoz issued Pierce another EVR after Pierce refused to meet with Albandoz in her office. (Def.'s SMF, ECF No. 35, at ¶ 169.) Prior to receiving the EVR, Pierce had emailed Albandoz stating that she "d[id] not feel as though [Albandoz's office] is a safe environment for [her] in light of [Albandoz's] continued harassment and retaliation." (*Id.*) After a board hearing regarding the EVR, the violation was reduced to a verbal warning. (*Id.* at ¶ 173.)

Pierce filed a fourth charge of discrimination with the EEOC and cross-filed with the Pennsylvania Human Relations Commission on April 11, 2018. (Def.'s Mem. Supp. Ex. P.) She filed this lawsuit on December 11, 2017 and eventually filed a Second Amended Complaint, the case's operative pleading, on June 25, 2018. (Compl., ECF No. 1; Second Am. Compl., ECF No. 18.)

## II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice. *Id.* at 252. There must be evidence by which a jury could reasonably find for the non-moving party. *Id.*

Reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). A court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

Pierce claims the City violated her rights under 42 U.S.C. § 1981 (Count I), the Equal Protection Clause (Count II),[6] Title VII (Count III), the PHRA (Count V) and the PFPO (Count VI) by discriminating against her on the basis of race, harassing her and retaliating against her.[7]  She contends that the City discriminated against her by failing to promote her to the HSPA and the CJO Director positions, subjected her to a hostile work environment by forcing her to work in a place where race is considered in promotional decisions and retaliated against her for complaining of discrimination and harassment by (i) failing to promote her to the CJO Director position, (ii) issuing her unwarranted EVRs and (iii) subjecting her to a retaliatory hostile work environment.

Because genuine issues of material fact remain as to whether race was a motivating or determinative factor in the City's failure to promote Pierce to the HSPA position, neither party is entitled to judgment on that claim.  Material issues of fact also preclude judgment for the City on Pierce's retaliation claims under Title VII, the PHRA and the PFPO for issuing the EVRs and for also allegedly subjecting her to a retaliatory hostile work environment.  The City's Motion is granted as to all other claims.  No reasonable juror could find that the City discriminated or retaliated against Pierce by failing to promote her to the CJO Director position or subjected her to a hostile work environment on the basis of race.  Similarly, no evidence in the record

---

[6]     Pierce brings the claims asserted in Counts I and II of her Second Amended Complaint as two separate causes of action under 42 U.S.C. § 1983.  *See* (ECF No. 11).

[7]     Pierce withdrew Count IV of the Second Amended Complaint, which alleged violations of her rights under the ADA, on July 17, 2018.  (ECF No. 25.)

would lead jurors to find that the City retaliated against Pierce or subjected her to a retaliatory hostile work environment pursuant to a municipal policy or custom.

A

Pierce believes she can prove that the City discriminated against her on the basis of race under the both the mixed-motive analysis set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which requires her to show that race was a motivating factor in the City's failure to promote her, and the pretext analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires her to show that race was a determinative factor in the City's decisions. *See Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008) ("A Title VII plaintiff may state a claim for discrimination under either the pretext theory . . . or the mixed-motive theory."); *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010) (applying both mixed-motive and pretext theories to plaintiff's discrimination claim under § 1981). Pierce is not required at this stage of the litigation to specify under which theory she intends to prove her discrimination claims.[8]

---

[8]     *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016) (noting that even at trial, the plaintiff may present her case under both theories, "provided that, prior to instructing the jury," the Court decides whether one or both theories apply). In any event, the application of the mixed-motive theory can be confused and confusing, leading at least one writer to refer to the process as a "chaotic mess." *See* Kaitlin Picco, *The Mixed-Motive Mess: Defining and Applying a Mixed-Motive Framework*, 26 A.B.A. J. Lab. & Emp. 461 (2011). Fortunately, the Court doesn't have to navigate through that fog just yet and decide, for the purposes of ruling on the summary judgment motions, whether the mixed-motive analysis applies to any of Pierce's claims. With respect to the HSPA promotion, there is a genuine issue of fact under both theories as to whether the city discriminated against Pierce by failing to promote her. With respect to the CJO promotion, no reasonable juror could find under either theory that the City discriminated against her by promoting Pendleton.

Under the pretext discrimination theory, the same legal standard applies to Pierce's claims under Title VII, § 1981, the Equal Protection Clause, the PHRA and the PFPO: Pierce must prove that race was a determinative factor in the City's failure to promote her.[9] To do so, Pierce must first establish a *prima facie* case of discrimination, which is not an onerous burden. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). She must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. *Id.*; *see also Booker v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 575, 580 (E.D. Pa. 2012) (noting that the same *prima facie* elements are required to state Title VII and § 1981 employment discrimination claims under the pretext theory).

The City must then "rebut the presumption of discrimination by producing evidence that [Pierce] was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. If it can do so, the burden shifts back to Pierce to show that the City's proffered reason for failing to promote her was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that

---

[9] *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (analyzing Title VII, § 1981 and PHRA race discrimination claims together under the pretext theory); *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) (analyzing Equal Protection Clause and § 1981 race discrimination claims together under the pretext theory); *Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp. 2d 373, 376 (E.D. Pa. 2000) (analyzing Title VII, § 1981 and PFPO race discrimination claims together under the pretext theory).

the employer's proffered explanation is unworthy of credence." *Id.* at 256 (citing *McDonnell Douglas*, 411 U.S. at 804–805).

2

The Third Circuit Court of Appeals has applied a different legal standard under a mixed-motive analysis to Title VII,[10] PHRA and PFPO discrimination claims than to claims under § 1981[11] and the Equal Protection Clause.[12]

To prove that the City violated Title VII under the mixed-motive theory, Pierce must demonstrate—using direct or circumstantial evidence—that race was a motivating factor in the City's failure to promote her. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (observing that Title VII is silent with respect to the type of evidence required to meet this burden).[13] If Pierce meets her burden to show that race was a motivating factor in the City's decision not to promote her, the City must show it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B). If the City meets this burden, the Court "may grant declaratory relief, injunctive relief . . . attorney's fees and costs" to Pierce, but

---

[10]    Title VII provides that "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

[11]    42 U.S.C. § 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts." The term "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Anderson*, 621 F.3d at 267 (quoting 42 U.S.C. § 1981(b)).

[12]    The Fourteenth Amendment's Equal Protection Clause prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

[13]    The Court's analysis of Pierce's Title VII claims under the mixed-motive discrimination theory applies to her PHRA and PFPO race discrimination claims. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently."); *Johnson v. Phila. Police Dep't*, 2015 WL 12914147, at *4 (E.D. Pa. July 20, 2015), *aff'd*, 657 F. App'x 83 (3d Cir. 2016) (citing *Joseph v. Continental Airlines, Inc.*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000)).

"shall not award damages or issue an order requiring . . . [Pierce's] promotion." *Id.* at § 2000e-5(g)(2)(B)(i)–(ii).

As under Title VII, Pierce may prove that the City violated § 1981 and the Equal Protection Clause under the mixed-motive discrimination theory by demonstrating that race was a motivating factor in the City's failure to promote her. *Anderson*, 621 F.3d at 269; *Sec. & Data Techs., Inc. v. Sch. Dist. of Phila.*, 145 F. Supp. 3d 454, 466 (E.D. Pa. 2015). Unlike in the Title VII context, however, Pierce must produce "direct evidence" that race was a motivating factor in the City's decision. *Anderson*, 621 F.3d at 267–68 (citing *Price Waterhouse*, 490 U.S. at 277). The evidence must be (1) strong enough to permit a fact-finder to infer that a discriminatory attitude was more likely than not a motivating factor in the City's decision and (2) connected to the City's decision, meaning that "any statements made . . . must [have been] made at a time proximate to the challenged decision and by a person closely linked to that decision." *Id.* at 269 (citing *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513–16 (3d Cir. 1997)). The evidence must demonstrate that a decisionmaker "placed substantial negative reliance on an illegitimate criterion" in reaching the decision. *Id.* (quoting *Walden*, 126 F.3d at 513) (observing that these requirements create a "high hurdle" for the plaintiff).

As in the Title VII context, if Pierce produces direct evidence that race was a motivating factor in the City's decision, the burden shifts to the City to show it would have made the same decision in the absence of discriminatory animus. *Id.* (citing *Walden*, 126 F.3d at 512–13). Unlike under Title VII, however, the City "has a complete defense to liability" under § 1981 and the Equal Protection Clause if it meets this burden. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 n.5 (3d Cir. 2009).

Pierce believes she was denied promotion to the HSPA position because of her race. The City concedes that Pierce has established a *prima facie* case of race discrimination; it contends that there is sufficient record evidence of a legitimate, non-discriminatory reason for not promoting her: Albandoz performed better than Pierce during her interview for the position. The City has met this "relatively light" burden. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)).

Pierce does not contend that the City discriminated against her before June 24, 2016, the day she and Albandoz sat for their interviews. (Hr'g Tr. 6:11–25.) Both were selected for an interview pursuant to civil service regulations, including the "rule of two," which required the PDP to interview the two interested applicants with the highest scores on the civil service examination. (Def.'s SMF, ECF No. 41, at ¶¶ 82, 87; Pl.'s SMF, ECF No. 32, at ¶¶ 15–16.) After Pierce's interview, the panelists—Carney, Resnick, Bryant, Bagby and Delaney—wrote that Pierce had answered the panelists' questions only partially, gave superficial responses, had trouble focusing, did not present well and had moments of loss of thought. (Pl.'s Mem. Opp'n Ex. ZZ.) Carney and Resnick both testified that they thought the panelists agreed that Albandoz's interview performance was superior to Pierce's. (Carney Dep. 200:3–6; Resnick Dep. 86:20–22.) Pierce herself admitted that she was ill during the interview and "might not have been as jolly and upbeat that [sic] [she] might have been normally" while the panelists were evaluating her. (Pierce Dep. 63:17–19, 71:22–23.)

There is, however, sufficient record evidence from which reasonable jurors could find that the City's stated reason is not why Pierce lost out to Albandoz. Pierce makes two arguments to support a finding of pretext: first, race discrimination was more likely than not a motivating or determinative factor in the City's decision, and second, a reasonable jury could disbelieve the City's stated reason for not promoting her. Because the record could allow the jury to find that discrimination based on race was more likely than not a motivating or determinative factor in the City's decision, the Court need not address Pierce's second pretext argument.

Reasonable jurors could conclude that Pierce was not promoted to the HSPA position because, unlike Albandoz, she is not Hispanic. The record shows that the City, including the PDP, has a goal of building a racially diverse municipal workforce that reflects the city's demographics, and Mayor Kenney instructed Carney to implement this "unwritten policy" in the PDP once she became commissioner. (Pl.'s Mem. Opp'n Ex. K; Def.'s Mem. Opp'n Ex. X; Carney Dep. 38:10–15, 39:19–24.) Delaney, the PDP's highest-ranking human resources staff member, testified that she believes the City's "policy" of building a racially diverse workforce is discriminatory and violates the PDP's EEO policy. (Delaney Dep. 30:6–9, 40:17–21, 41:10–42:8, 115:8–11.) The record also reflects that in April of 2016, Carney received, through Abernathy, two emails encouraging the appointment of Albandoz to an executive-level position in the PDP in order to increase Latino representation, and in June of 2016, the percentage of executive-level Hispanic staff members at the PDP did not reflect Philadelphia's Hispanic population. (Pl.'s SMF, ECF No. 32, at ¶¶ 35, 37, 39, 41.) Finally, Abernathy's response to Colon's email, which Carney reviewed, stated "we will do what

we can to promote Latinos within the confines of civil service regulations." (Pl.'s Mem. Opp'n Ex. T.)

A reasonable juror considering this evidence could find that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of [the City's] action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Fuentes*, 32 F.3d at 764). Given the City's goal to increase the number of executive-level Hispanics in the PDP, pressure on Carney from Kenney, Quiñones-Sanchez and Colon to meet this goal and emails specifically recommending Albandoz for an executive-level position, there is a genuine issue of fact as to whether the City promoted Albandoz on the basis of race. The jurors should be allowed to interpret the statement "we will do what we can to promote Latinos within the confines of civil service regulations" along with other record evidence and determine for themselves whether Carney seized the opportunity to promote Albandoz, once she had met the civil service requirements for the HSPA position, because of her race.[14]

---

[14] Because the record could allow for a finding that an invidious discriminatory reason was more likely than not a motivating or determinative cause in the City's decision not to promote Pierce to the HSPA position, a reasonable jury could also find that race was a motivating factor in the City's decision under the mixed-motive analysis that applies to Pierce's discrimination claim under Title VII. *See Burlington v. News Corp.*, 759 F. Supp. 2d 580, 601 (E.D. Pa. 2010) ("[W]here a court performing a *McDonnell Douglas* analysis has fully considered whether 'an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action,' it seems redundant to then consider whether an impermissible trait 'was a motivating factor for any employment practice [under Title VII].'" (internal citations omitted)).

In addition, because Pierce has produced sufficient evidence to survive summary judgment under the pretext theory, which applies to her discrimination claim under Title VII, § 1981 and the Equal Protection Clause, the Court need not determine for the purposes of these Motions whether Pierce has presented sufficient direct evidence to show that race was a motivating factor in the City's decision under § 1981 and the Equal Protection Clause.

2

Pierce also believes she was not promoted to the CJO Director position because of her race. The City again concedes that Pierce has established a *prima facie* case of race discrimination with respect to this claim and again correctly contends that the record shows it had a legitimate, non-discriminatory reason for failing to promote Pierce to the CJO Director position: Pendleton performed better than Pierce during his interview.

After Pierce's interview, the panelists—Carney, Chapman, Vrato and Lockwood—wrote that Pierce seemed likely to "lean on" the Commissioner if she was appointed to CJO Director and she stated she is not good at or comfortable with public speaking. (Pl.'s Mem. Opp'n Ex. JJ.) Carney testified that Pendleton was more qualified for the position in part due to his public speaking ability; she was searching for someone "very poised with public speaking, that can engage with a number of stakeholders at various levels." (Carney Dep. 333:9–12; 339:20–23.) Indeed, when the PDP announced the open position, it stated that the CJO Director must "[r]espond to community inquiries" and "serve[ ] as the liaison for . . . [c]ommunity organizations," and that candidates must possess strong communication skills and the ability to develop and maintain a rapport with community groups. (Pl.'s Mem. Opp'n Ex. II.) Lockwood is the only panelist who recommended Pierce for the position. *See* (Carney Dep. 364:8–10, 364:17–365:13, 366:8–10; Chapman Dep. 39:15, 46:5–8; Vrato Dep. 123:5–6; Lockwood Dep. 61:5).

Unlike in the context of the City's failure to promote Pierce to the HSPA position, however, the record does not allow reasonable jurors to find that the City's

stated reason for not promoting her to the CJO Director position is pretextual. Pierce again makes two arguments to support her pretext argument: race discrimination was more likely than not a motivating or determinative factor in the City's decision, and that a reasonable jury could disbelieve the City's stated reason for not promoting her.[15]

In support of her first argument, Pierce again relies on the fact that the City has a goal of creating a diverse workforce that reflects Philadelphia's demographics, as well as the evidence that suggests the City has a policy of considering race in personnel decisions. Pierce makes no attempt, however, to connect this evidence with Carney's decision to appoint Pendleton to the CJO Director position. There is no evidence that the percentage of executive-level African American staff members at the PDP did not reflect Philadelphia's African American population before Pendleton was hired. There is no evidence that anyone asked or urged Carney to appoint Pendleton to an executive-level position and there is similarly no record evidence that Carney felt any pressure to appoint Pendleton specifically because he is African American.[16]

In support of her second pretext argument, Pierce argues that a jury could disbelieve the City's stated reason for its failure to promote her to the CJO Director position because she believes she was more qualified for the position than Pendleton. Pierce specifically cites to the fact that Pendleton did not have the requisite experience for the position when he first applied in July of 2017, (Def.'s SMF, ECF No. 35, at

---

[15]     While Pierce makes her best arguments in an effort to stave off summary judgment on her race discrimination claim with respect to the CJO position, counsel tacitly acknowledged the weakness of this claim when, at oral argument, he stated that Pierce only moved herself for summary judgment on the failure to promote her to the HSPA job because "that's the position" (as opposed to the CJO opening) "where [the City] favored race." (Hr'g Tr. 15:12–17.)

[16]     Because Pierce offers no evidence, let alone direct evidence, upon which a reasonable juror could find that the City did not promote her to the CJO position because of her race, Pierce cannot prove this claim under the mixed-motive discrimination theory either.

¶ 112), whereas Pierce had a decade of experience as a social work supervisor at the time of her interview. She also contends that a jury could disbelieve that her interview was worse than Pendleton's interview because all of the panelists indicated on their review forms that Pendleton and Pierce would both be "acceptable" for the position. (Pl.'s Mem. Opp'n Ex. JJ.)

Pierce's evidence does not demonstrate such weaknesses, implausibilities or inconsistencies in the City's stated reason for its failure to promote her that a juror could reasonably render that reason unworthy of credence. *See Fuentes*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). Neither Pierce's long tenure as a social work supervisor nor the fact that she and Pendleton were both deemed acceptable for the position conflicts with the City's determination that Pendleton was better suited to the CJO Director position based on his interview performance.

Finally, Pierce claims that the City's reliance on Pendleton's superior interview performance, which she characterizes as "an entirely subjective reason," is itself evidence of pretext. Pierce cites *Tomasso*, 445 F.3d at 706, and *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000), for the proposition that the City's use of subjective criteria in an employment decision may be pretext for discrimination. In *Tomasso* and *Goosby*, the Third Circuit Court of Appeals found that an employer's subjective evaluation of qualities like "attitude" and "teamwork" or "drive, selling process, [and] relationship building," respectively, are "more susceptible of abuse and more likely to mask pretext." *Tomasso*, 445 F.3d at 706; *Goosby*, 228 F.3d at 317 n.1, 320. The Court also observed, however, that a plaintiff cannot prove pretext "merely

because his/her employer relied upon highly subjective qualities" and that subjective evaluations are sometimes necessary to "distinguish otherwise competent employees." *Goosby*, 228 F.3d at 317 n.1, 321; *Tomasso*, 445 F.3d at 711.

The record reflects that the City considered objective criteria when it chose Pendleton for the CJO Director position. Pendleton had the requisite experience as a social work supervisor, knowledge of the correctional standards, policies and procedures and demonstrated oral communication skills. *See* (Carney Dep. 339:13–14, 340:7–10; Pl.'s Mem. Opp'n Ex. II.) The panelists observed that Pierce was either not good at, or not comfortable with, public speaking and she seemed likely to lean on the commissioner for assistance if she was appointed. To the extent that the panelists' evaluations of Pierce's interview were "subjective," Pierce offers no evidence upon which a reasonable juror could disbelieve that Pendleton performed better during his interview for the position, and Pierce cannot establish pretext merely because the City relied on subjective criteria.

B

To establish a hostile work environment discrimination claim, Pierce must show (1) she suffered intentional discrimination because of her race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person in like circumstances and (5) the City is liable for the discrimination. *Felder v. Penn Mfg. Indus., Inc.*, 182 F. Supp. 3d 203, 208 (E.D. Pa. 2016) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d

157, 167 (3d Cir. 2013)).[17]  Even if Pierce establishes these elements, the City is not liable for creating a hostile work environment if it can prove (1) it exercised reasonable care to prevent and correct promptly any harassing behavior and (2) Pierce "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998).

Pierce believes the City subjected her to a hostile work environment by forcing her to work "each day in an environment where you know you're going to be subjected to decisions based - - *promotional* decisions based on your race." ((Hr'g Tr. 97:9–12) (emphasis added).)  First of all, Pierce acknowledges that the actions allegedly comprising a race-based hostile work environment were all perpetrated by Albandoz. (Hr'g Tr. 96:12–15.)  While Albandoz made no promotional decisions, Pierce offers the following evidence of severe or pervasive race-based discrimination: Albandoz treated her in a more dismissive manner than other social work supervisors (Pl.'s SMF, ECF No. 40, at ¶ 76), Albandoz denied her full-time clerical and social work support staff (Pierce Dep. 121:19–21, 171:10–24), Albandoz denied or ignored her requests for overtime (*Id.* at 131:1–13), Albandoz denied her lunch breaks (Pl.'s SMF, ECF No. 40, ¶ 84) and Albandoz issued her two unwarranted EVRs (Def.'s SMF, ECF No. 35, at ¶¶ 92, 169).

---

[17]     The Court's analysis of Pierce's hostile work environment claim under Title VII applies to her harassment claims under § 1981, the PHRA and the PFPO.  *Verdin v. Weeks Marine Inc.*, 124 F. App'x 92, 96 (3d Cir. 2005) (citing *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 826 n.3 (3d Cir. 1994)); *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Joseph*, 126 F. Supp. 2d 376.

Notwithstanding Pierce's myriad allegations, there is no record evidence upon which a reasonable jury could find she was severely or pervasively discriminated against because of her race.[18]   The alleged harassment is not severe, and while it may arguably have been pervasive, none of the conduct Pierce describes was based on race. There is no evidence (at all) that Albandoz treated Pierce poorly because of Pierce's race and Pierce fails to satisfy the first element of her hostile work environment claim.

## C

To prove that the City retaliated against her in violation of Title VII, § 1981, the PHRA and the PFPO, Pierce must show (1) she engaged in protected activity, (2) the City took a materially adverse employment action against her at the time or after her protected conduct and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  Pierce "may rely on a 'broad array of evidence' to demonstrate a causal link" between protected activity and the adverse employment action.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).  "[U]nusually suggestive" temporal proximity between protected activity and the adverse action may be sufficient to establish a causal connection, *Marra*, 497 F.3d at

---

[18]    Pierce also alleges that the City failed to promote her to the CJO position, Bagby refused to speak with her regarding her discrimination and retaliation claims (Pierce Dep. 198:13–18), the OPC denied her requests to remove Albandoz from her position as Pierce's supervisor (Pl.'s Mem. Opp'n Ex. OO; Vrato Dep. 143:1–144:2; Pl.'s SMF, ECF No. 40, at ¶¶ 149, 155) and the City denied her requests to attend ACA, AJA and POF conferences (Pl.'s SMF, ECF No. 40, at ¶¶ 139–41, 156).  It is unclear from the briefing whether these allegations support Pierce's race-based hostile work environment claim or her retaliatory hostile work environment claim.  To the extent that Pierce relies on them in support of her race-based hostile work environment claim, there is similarly no evidence that these actions were motivated by race.

302 (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)), but the mere passage of time "is not legally conclusive proof against retaliation." *Id.* (citing *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)). If temporal proximity is not unduly suggestive of a causal connection, the Court "may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for [the adverse employment action] or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." *Marra*, 497 F.3d at 302 (internal citations omitted).

After Pierce establishes a *prima facie* claim of retaliation, the City must provide a legitimate, non-discriminatory reason for taking the alleged retaliatory action. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (citing *Moore*, 461 F.3d at 342). Pierce must then point to evidence that would cause a factfinder to reasonably either disbelieve the employer's articulated legitimate reasons or believe that an invidious retaliatory reason was more likely than not a determinative cause of the employer's action. *Stone v. Johnson*, 196 F. Supp. 3d 562, 568 (E.D. Pa. 2016), *aff'd sub nom., Stone v. Sec'y U.S. Dep't of Homeland Sec.*, 705 F. App'x 76 (3d Cir. 2017) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 199 (3d Cir. 2015)). Unlike the lower causation requirements at the *prima facie* stage, see *Carvalho-Grevious*, 851 F.3d at 259, the plaintiff has the ultimate burden here to prove that retaliatory animus was the "but-for" cause of the adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013). Pierce must therefore establish causation twice: first, to demonstrate a causal connection as part of the *prima facie* case, and second, to

satisfy her ultimate burden of persuasion by proving pretext. *Carvalho-Grevious*, 851 F.3d at 257.

i

The City concedes that Pierce has stated a *prima facie* claim of retaliation for its failure to promote her to the CJO Director position, but argues it had a legitimate, non-discriminatory reason for not promoting her: Pendleton's superior interview performance. *See supra* Section III.A.ii.2. The City further argues Pierce cannot show pretext.

Pierce believes she can establish pretext by showing that retaliation was more likely than not a determinative cause of the City's decision. She relies on the temporal proximity between her complaints of discrimination, first to the EEOC on June 9, 2017, (Def.'s SMF, ECF No. 35, at ¶ 106) then informally to Delaney on July 25, 2017, (Pl.'s Mem. Opp'n Ex. EE), and the City's decision not to promote her to the CJO Director position on August 18, 2017. (Pl.'s SMF, ECF No. 40, at ¶ 110.)[19]

Although "evidence supporting the prima facie case is often helpful in the pretext stage," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000), Pierce cannot rely solely on temporal proximity to establish pretext. *See, e.g.*, *Carlson v. Twp. of Lower Alloways Creek*, 452 F. App'x 95, 101 (3d Cir. 2011); *Houston v. Dialysis Clinic, Inc.*, 2015 WL 3935104, at *11 (D.N.J. June 26, 2015) (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)). Pierce offers no other evidence to suggest that Carney did not promote Pierce because she had previously made complaints of

---

[19]     The Court has already addressed and rejected Pierce's argument that a reasonable jury could disbelieve the City's legitimate, non-discriminatory reasons for promoting Pendleton to the CJO role. *See supra* Section III.A.ii.2.

discrimination, harassment and retaliation, and as such, no reasonable juror could conclude that the City's stated reasons for choosing to promote Pendleton over Pierce are pretextual.

ii

The City argues that Pierce cannot establish the second or third elements of a *prima facie* claim for retaliation with respect to the EVRs Albandoz issued to Pierce because the EVRs were not materially adverse employment actions and there is no causal connection between them and Pierce's protected conduct. The City also asserts that Albandoz had a legitimate, non-discriminatory reason for issuing the EVRs: Pierce failed to comply with prison policies and Albandoz's orders.

An employment action is materially adverse if "a reasonable employee would have found the challenged action materially adverse . . . mean[ing] it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & S.F. Ry. V. White*, 548 U.S. 53, 68 (2006). Materially adverse actions do not include "petty slights or minor annoyances that often take place at work," but the "significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* Although the EVRs did not dissuade Pierce from subsequently filing charges of discrimination with the EEOC, the Court must consider whether the EVRs would have dissuaded an objectively reasonable employee from filing such charges. The record reflects that the PDP uses EVRs "where a Written Warning is not considered to be suitable, or in situations where a member has already received a Written Warning in the past." (Pl.'s SMF, ECF No. 40, at ¶ 86.) The grievance procedure following an employee's receipt of an EVR requires the employee to defend

33

her conduct at a preliminary hearing and again at a formal board hearing. (Def.'s SMF, ECF No. 35, at ¶ 95; Pl.'s SMF, ECF No. 40, at ¶ 91.) Pierce received EVRs for leaving her post without permission to give a tour to her union's health and safety committee and for refusing to meet with Albandoz in her office because Pierce felt unsafe there. (Def.'s SMF, ECF No. 35, at ¶¶ 92, 169; Pierce Dep. 204:17–205:11.) Pierce appealed the violations and one EVR was reduced to a verbal warning while the other was dismissed entirely. (Def.'s SMF, ECF No. 35, at ¶¶ 96, 173.) Given this evidence, and considering the particular circumstances in which Albandoz issued the EVRs, a jury could find that the EVRs were materially adverse employment actions for the purposes of Pierce's retaliation claim.

As for the causal connection between the EVRs and Pierce's protected conduct, Pierce argues that her May 22, 2017 EVR relates to the EEOC charge she filed on October 3, 2016 because during this period, Albandoz exhibited a pattern of antagonism toward Pierce and treated Pierce differently than other social work supervisors. While a bit unclear as to the exact dates of the antagonistic conduct, the record reflects that after Albandoz's promotion in July of 2016, Albandoz treated her more dismissively than other social work supervisors, (Pl.'s SMF, ECF No. 40, at ¶ 76), denied her full-time clerical and social work support staff, (Pierce Dep. 121:19–21; 171:10–24), denied or ignored her requests for overtime, (Pierce Dep. 131:1–13) and denied her lunch breaks on January 9, 2017, April 20, 2017, (Pl.'s SMF, ECF No. 40, ¶ 84). Pierce argues that her February 27, 2018 EVR pertains to her complaint of unlawful treatment to Albandoz and her union president on January 31, 2017 (Pl.'s Mem. Opp'n Ex. UU) and her February 20, 2017 OPC complaint (Pl.'s SMF, ECF No. 40, at ¶ 149). This evidence

is sufficient to allow the jurors to conclude that the EVRs were causally connected to Pierce's complaints of unlawful discrimination, harassment and retaliation.

The City asserts it had a legitimate, non-discriminatory reasons for issuing both EVRs: Pierce did not request permission to leave her post in order to give a tour to the union's health and safety committee and Pierce disobeyed a direct order from her supervisor, Albandoz, and refused to meet with her.

Pierce believes she can prove that the City's stated reasons for issuing the EVRs are pretext for retaliation because a reasonable jury could disbelieve the City's stated reasons for its decisions. Specifically, after a formal board hearing on the first EVR, the PFP found the charge was unsubstantiated and dismissed the violation entirely. (Def.'s SMF, ECF No. 35, at ¶ 96.) After a board hearing on the second EVR, the violation was reduced to a verbal warning. (*Id.* at ¶ 173.) This evidence, in addition to the evidence that establishes a causal connection between the EVRs and Pierce's protected conduct, could allow a reasonable juror to find that the City's stated reasons are pretextual.

### iii

Lastly, Pierce claims the City retaliated against her by subjecting her to a hostile work environment. In *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006), the Third Circuit Court of Appeals recognized that a plaintiff may bring a retaliatory hostile work environment claim under Title VII. Such a claim may proceed if the plaintiff shows that a reasonable employee would have found the alleged retaliatory harassment "materially adverse." *Hare v. Potter*, 220 F. App'x 120, 131–32 (3d Cir. 2007) (citing *Moore*, 461 F.3d at 341).

The *prima facie* elements of a retaliatory harassment claim do not differ from those of other retaliation claims. *See Clarkson v. Septa*, 2016 WL 1637279, at *10 (E.D. Pa. Apr. 25, 2016), *aff'd*, 700 F. App'x 111 (3d Cir. 2017); *Phillips v. Potter*, 2009 WL 1362049, at *2 (W.D. Pa. May 14, 2009). The record shows that Pierce engaged in protected activity on multiple occasions beginning October 3, 2016 when she filed her first EEOC charge of discrimination. She filed three subsequent EEOC charges on June 9, 2017, September 12, 2017 and April 11, 2018. (Def.'s SMF, ECF No. 35, at ¶¶ 106, 163; Def.'s Mem. Supp. Ex. P.) Pierce also complained to Delaney of discrimination, harassment and retaliation on July 25, 2017, (Pl.'s Mem. Opp'n Ex. EE), to the OPC on September 5, 2017 and February 20, 2018 (Pl.'s Ex. NN; Pl.'s SMF, ECF No. 40, at ¶ 149), and to Albandoz and her union president, (Pl.'s Mem. Opp'n Ex. UU).

Pierce relies on the evidence presented in support of her hostile work environment claim based on race, *see supra* Section III.B, to show that she suffered materially adverse treatment at the time of or after her protected conduct. While her race-based claim fails to present a question for the jurors for the reasons given in Section III.B, the record evidence would allow a reasonable juror to find that Pierce was subjected to materially adverse conditions when Albandoz: treated her in a more dismissive manner than other social work supervisors (Pl.'s SMF, ECF No. 40, at ¶ 76), denied her full-time clerical and social work support staff (Pierce Dep. 121:19–21; 171:10–24), denied or ignored her requests for overtime (Pierce Dep. 131:1–13), denied her lunch breaks (Pl.'s SMF, ECF No. 40, ¶ 84) and issued her two unwarranted EVRs

(Def.'s SMF, ECF No. 35, at ¶¶ 92, 169).[20]  *See Hare*, 220 F. App'x at 132 ("[W]hen we consider the evidence as a whole and under the less-demanding standard of "materially adverse," we believe there is competent evidence from which a jury could reasonably find the [employer's] actions . . . were motivated out of retaliatory animus and created a hostile work environment.").  A reasonable juror could also find that Albandoz's behavior toward Pierce was causally connected to Pierce's complaints to the EEOC, the OPC, Delaney, and Albandoz for many of the reasons that support Pierce's EVR retaliation claim.  *See supra* Section III.C.ii.

Pierce does not contest that the City has articulated legitimate, non-discriminatory reasons for the conduct that she alleges contributed to a retaliatory hostile work environment, and she does not articulate a pretext argument specifically tailored to her retaliatory hostile work environment claim.  For reasons that support Pierce's pretext argument in the context of her retaliation claim, however, there is enough evidence in the record upon which a reasonable juror could either find that retaliation was more likely than not the cause of the hostile work environment or disbelieve the City's stated reasons for creating a hostile work environment.

D

Counts I and II of Pierce's Second Amended Complaint allege violations of § 1981 and the Equal Protection Clause, both brought under 42 U.S.C. § 1983.  The City is only

---

[20]     Although Pierce alleges that several other incidents—Bagby's refusal to speak with her, the OPC's denial of her requests to remove Albandoz from her position and the City's denial of her requests to attend conferences, *see supra* Section III.B n.17—contributed to a retaliatory hostile work environment, Pierce makes no argument that any of these employment actions were causally connected to her protected conduct.  Even if she could, she offers no support for a finding that the City's reasons for taking these actions were pretext for retaliation.

To the extent Pierce argues that the City's failure to promote her to CJO Director contributed to a retaliatory hostile work environment, the Court has already held that no reasonable juror could find the City retaliated against her by failing to promote her to that position.  *See supra* Section III.C.i.

liable for violating Pierce's rights under § 1981 and the Equal Protection Clause if Pierce can demonstrate that the City deprived her of those rights while acting under color of state law. *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995).

In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), the Supreme Court articulated a "two-path track to municipal liability under § 1983"— either through municipal policy or custom. *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). A municipal policy is created when a decisionmaker possessing final authority to establish municipal policy with respect to an action issues an official proclamation, policy or edict. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003) (quoting *Kneipp*, 95 F.3d at 1212). A custom is a course of conduct so permanent and well-settled as to virtually constitute law. *Kneipp*, 95 F.3d at 1212 (quoting *Beck*, 89 F.3d at 971). "[A] prerequisite to establishing liability in either situation is a showing that a policymaker was responsible either for the policy or, through acquiescence, for the custom." *Id.*

Pierce may establish that the City acted pursuant to municipal policy or custom by showing (1) a City employee "acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity," (2) an individual with policymaking authority rendered his or her behavior an act of official government policy or (3) an official with authority ratified the unconstitutional acts of a subordinate, rendering such behavior official for liability purposes. *Sec. & Data Techs., Inc.*, 145 F. Supp. 3d at 467 (citing *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005)). The City is not vicariously liable for its employees' conduct. *Wilson v. City of*

*Phila.*, 177 F. Supp. 3d 885, 908 (E.D. Pa. 2016) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

Pierce must also establish that the municipal policy or custom was the proximate cause of the injuries she sustained. *Id.* at 1213 (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850 (citing *Estate of Bailey by Oare v. Cty. of York*, 768 F.2d 503, 507 (3d Cir. 1985)). Whether the government policy or custom proximately caused the constitutional violation is a question for the jury, so long as the causal link is not too attenuated. *Kneipp*, 95 F.3d at 1213 (citing *Bielevicz*, 915 F.2d at 850).

i

Pierce argues that the City is liable for discriminating against her on the basis of race in violation of § 1981 and the Equal Protection Clause because the City has a policy and custom of considering race in hiring decisions at the PDP.[21]  Pierce contends that Carney applied the Mayor's Diversity Initiative—intended to create a workforce that "looks like the City of Philadelphia"—within the PDP by making promotional decisions based on race. *See* (Hr'g Tr. 106:11–14).

The Court has already found, *see supra* Section III.A.ii.1, that the record contains sufficient evidence upon which a reasonable juror could find that Carney promoted Albandoz to the HSPA position over Pierce on the basis of race.  The record

---

[21]     Pierce primarily argues that the City has a policy of discriminating on the basis of race, *see* (Hr'g Tr. 105:2), though she also claims in her Response in Opposition to the City's Motion that discrimination is a City custom.

also reflects that Mayor Kenney instructed Carney to implement his "unwritten policy" of building a racially diverse municipal workforce that reflects the City's demographics in the PDP once she became commissioner. (Carney Dep. 38:10–15, 39:19–24.) Human Resources Manager Delaney testified that the policy is discriminatory and violates the PDP's EEO policy (Delaney Dep. 30:6–9; 40:17–2; 41:10–42:8; 115:8–11) and Deputy Commissioner Tomaszewski testified that since Mayor Kenney took office, Tomaszewski believes there has been an unwritten policy at the PDP and that race is taken into consideration in hiring decisions. (Tomaszewski Dep. 57:8–13, 70:2–9.)

On the evidence presented, a reasonable jury could find that Carney applied a discriminatory policy within the PDP by making promotional decisions on the basis of race in an effort to build a workforce in the PDP that reflects the demographics of the City. *See Sec. & Data Techs., Inc..*, 145 F. Supp. 3d at 468 (finding "sufficient evidence upon which a reasonable fact finder could find that [the school district] had an unwritten policy of favoring race discrimination in contract awards" where the record showed that school district employees were directed to increase minority contracting and award contracts on the basis of race).

ii

To establish municipal liability for Pierce's retaliation claims under § 1981, Pierce must provide evidence of an unlawful municipal policy or custom which proximately caused the City to retaliate against her for engaging in protected activity. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988). She has not done so on this record. Pierce has pointed to only one policy in this case—the Diversity Initiative which, as applied in the PDP, purportedly led to race playing an impermissible factor in

Albandoz's promotion.  There is no evidence of any policy or custom which caused

Carney or anyone else at the PDP to retaliate against Pierce for engaging in protected

activity; Pierce does not even argue in her briefing that such a policy or custom existed.

An appropriate order follows.

BY THE COURT:

**_/s/ Gerald J. Pappert_**
GERALD J. PAPPERT, J.