# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DEANNA PIERCE,<br><br>*Plaintiff,*<br><br>v.<br><br>CITY OF PHILADELPHIA,<br><br>*Defendant.* | CIVIL ACTION<br>NO. 17-5539 |

**PAPPERT, J.**                                                            **June 13, 2019**

## MEMORANDUM

This litigation arose from the City of Philadelphia's promotion of three employees—one Latina and two African-Americans—in the City's Department of Prisons ("PDP"). Plaintiff Deanna Pierce, a Native-American woman, claimed the City discriminated against her on the basis of race when it did not promote her, then retaliated against her because she complained of discrimination. A jury found the City did not discriminate against Pierce but did retaliate against her; it awarded nominal damages. Pierce filed three post-trial motions. One seeks judgment as a matter of law—or in the alternative, a new trial—on her discrimination claims and a new trial on municipal liability and damages. (ECF No. 86.) The other seeks equitable and injunctive relief from retaliation. (ECF No. 78.) The most recent motion seeks a new trial on the grounds that the City failed to produce certain evidence during discovery. (ECF No. 101.) The Court denies all three motions in their entirety.

I

Pierce applied for three promotions within the PDP in 2015, 2016 (the "HSPA positions") and 2017 (the "CJO position"). She interviewed against Adrienne Lyde,

Jennifer Albandoz and Leroy Pendleton.  Both Lyde and Pendleton are African-American; Albandoz is Hispanic.  Pierce was not selected for any of the promotions.

She filed her lawsuit on December 11, 2017 (Compl., ECF No. 1), alleging claims of race discrimination for the City's failure to promote her in 2015, 2016 and 2017, hostile work environment and retaliation in violation of 42 U.S.C. § 1981, the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act and the Philadelphia Fair Practices Ordinance. (*Id.*)  In her Second Amended Complaint,[1] filed on June 25, 2018, she added a sixth claim of disability discrimination.  (ECF No. 18.)  She withdrew the disability claim on July 17, 2018.  (ECF No. 25.)  She withdrew the discrimination claims regarding 2015 promotion on November 1, 2018.  (ECF No. 33.)

Pierce moved for partial summary judgment on her discrimination claims over Albandoz's promotion to the HSPA position in 2016.  (ECF No. 32.)  The City moved for summary judgment on all claims.  (ECF No. 34.)  The Court denied Pierce's motion, (ECF Nos. 63, 64), and also denied the City's motion as to the discrimination claims regarding Albandoz's 2016 promotion and the retaliation claims under Title VII, the PHRA and the PFPO.  (*Id.*)  It granted the City's motion as to the discrimination and retaliation claims regarding Pendleton's promotion to the CJO position in 2017, the hostile work environment claims and the retaliation claims under § 1981.  (*Id.*)

Trial began on January 8, 2019 on the remaining claims: race discrimination for the City's failure to promote Pierce to the HSPA job in 2016 (in violation of § 1981, the

---

[1]     Plaintiff's First Amended Complaint, filed on February 23, 2018, clarified that her § 1981 and Equal Protection Clause claims were separate causes of action against under 42 U.S.C. § 1983. *See* (Am. Compl., ECF No. 4; Order, ECF No. 11).

Equal Protection Clause, Title VII, the PHRA and the PFPO) and retaliation (in violation of Title VII, the PHRA and the PFPO). (ECF No. 67.) On January 11, the jury returned a verdict for the City on the discrimination claims and for Pierce on the retaliation claims. The jurors awarded Pierce one dollar in nominal damages. (ECF No. 73.)

## II

Pierce moves for judgment as a matter of law on her race discrimination claim regarding Albandoz's 2016 promotion. She argues that under the mixed-motive discrimination analysis, which requires her to establish that race was a motivating factor in the City's decision, a reasonable jury could not have had a legally sufficient evidentiary basis to find for the City. To the contrary, the evidence provided the jurors with ample basis to conclude as they did.

Federal Rule of Civil Procedure 50 permits the Court to enter judgment as a matter of law where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. Rule Civ. P. 50(a)(1); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149 (2000). Reviewing all of the evidence in the record, the Court "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51 (citations omitted). The Court may not make credibility determinations or weigh the evidence, as those are "jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

A

Pierce was in 2016, and still is, a social work supervisor in the PDP. *See* (Jan. 8, 2019 Hr'g Tr. ("Jan. 8 Tr.") 46:2–4.) Social work supervisors report directly to Human Services Program Administrators ("HSPAs"). (*Id.* at 48:21–49:2.) The PDP has two HSPAs; both are civil service positions. *See* (*id.* at 119:22–24). Of particular relevance to Pierce's discrimination claims, to apply for a promotion to a civil service position, City employees must take a civil service examination. (*Id.* at 119:25–120:4; Jan. 9, 2019 Hr'g Tr. ("Jan. 9 Tr.") 86:24–87:3.) Under the "civil service rule of two," if there is one vacancy for a position, the City must interview the two interested candidates with the highest exam scores. (Jan. 8 Tr. 121:4–7; Jan. 9 Tr. 86:24–87:16.) The Commissioner of the PDP has final decision-making authority with respect to hiring and promotions. (Jan. 9 Tr. 175:24–176:3.)

Pierce took the civil service exam for the HSPA position in 2014, along with Adrienne Lyde, Dawn Hall and Jennifer Albandoz. (Jan. 8 Tr. 49:6–8; Trial Ex. 11.) Lyde scored highest, followed by Pierce, Hall and Albandoz, respectively. (Trial Ex. 11.) Pursuant to the civil service rule of two, Lyde and Pierce interviewed for the HSPA position when one became vacant in 2015. (Jan. 8 Tr. 52:17–22.) Lyde received the promotion. (*Id.* at 53:10.) Pierce thought the City failed to promote her because of her race and filed an EEOC charge of discrimination. (*Id.* at 118:10–119:7.)

In January of 2016, Philadelphia Mayor James Kenney took office. Blanche Carney was appointed Commissioner of the PDP several months later. (Jan. 9 Tr. 96:10–20.) In May of 2016, another HSPA position became available. (*Id.* at 97:18–98:20.) Pursuant to the rule of two, Dawn Hall and Pierce were slotted to interview for

the position, but shortly before the interview Hall decided not to pursue the job.[2] (*Id.* at 144:9–17, 158:8–9; Jan. 10, 2019 Hr'g Tr. ("Jan. 10 Tr.") 175:3–176:16.) As the person with the next-highest test score, Albandoz became eligible for consideration and she and Pierce were both interviewed for the HSPA position on June 24, 2016. (Jan. 8 Tr. 60:23–61:7; Jan. 10 Tr. 175:3–176:16.) The interview panelists—Commissioner Carney, former Acting Commissioner Michael Resnick, Deputy Commissioners Karen Bryant and Terrell Bagby and Human Resources Manager Tracey Delaney—each took contemporaneous notes on an interview evaluation form. *See* (Trial Exs. 27, 29–32). Albandoz received the promotion.[3] (Jan. 8 Tr. 62:17–19.)

Each panelist testified at trial and every interview evaluation form was admitted into evidence. The panelists' testimony was consistent with their contemporaneous notes. Delaney told the jury that Pierce began her interview by stating she did not feel well and "it took her a minute to gather her thoughts and answer the questions." (Jan. 9 Tr. 67:21–68:3.) Bagby testified that Pierce "had a hard time concentrating on the questions that [he] asked her," (Jan. 10 Tr. 72:6–7), and that the interview "was one of the weirdest . . . [he'd] ever participated on" because he had "never had someone who just completely said they just couldn't keep the questions in their head . . . ." (*Id.* at 73:3–7.) Resnick told the jury that Pierce's interview was "awful. She was horrible. . . .

---

[2]    *See infra* Section III.B.ii.1.

[3]    At trial, Pierce argued that the City was not technically required to interview Pierce for the position per the PDP's hiring and promotions policy, and the City's decision to interview her anyway is evidence that the City wanted Albandoz to receive the promotion. (Jan. 9 Tr. 145:2–12; Jan. 11, 2019 Hr'g Tr. ("Jan. 11 Tr.") 50:14–25.) First of all, Pierce's view that she should have been given the job without having to interview for it is somewhat presumptuous and a position that the jurors could have credited—or not. More importantly, the point is irrelevant. Pierce seems to contend that the interview was orchestrated to get Albandoz into the mix. Pierce knew all along, however, that she would be required to interview for the position before Dawn Hall removed herself from consideration; the interview was not scheduled with Albandoz in mind. *See* (Jan. 8 Tr. 123:7–124:22); *see also* (Jan. 10 Tr. 175:7–176:16).

[S]he couldn't formulate responses to [the panelists'] questions . . . . It just seemed like she was not focused." (*Id.* at 131:19–132:1.) Carney, Resnick and Bryant all testified that no one from the panel recommended Pierce for the position. (Jan. 9 Tr. 176:24–177:1, 207:2–3; Jan. 10 Tr. 135:7–8.)

Carney, the ultimate decisionmaker, was kinder in her assessment of Pierce's performance but explained why she too favored Albandoz after the interviews. She testified that "Ms. Albandoz fully answered and responded to the questions, she was better prepared. She came with . . . big goals and visions to expand service delivery in the prisons . . . . She gave good eye contact, engaged the board." (Jan. 9 Tr. 176:14–23.) "It wasn't that Ms. Pierce performed bad, she performed well, but when compared and competing for a position, Ms. Albandoz was the better candidate." (*Id.* at 162:10–13.)

Pierce's own testimony was in material part consistent with the panel members' assessment of her interview performance. She told the jury she was "extremely, extremely ill" on the day of her interview. (Jan. 8 Tr. 61:10.) She stated that during the interview, she was "focused on not throwing up and making sure that [she], you know, didn't have any accidents." (Jan. 9 Tr. 5:21, 6:6–8.) "Unfortunately or fortunately, [she] was able to push through, but [she] didn't feel like [her]self." (*Id.* at 6:10–12.) Moreover, it was Pierce's decision to interview even though she was, by her own account, far from her best that day. She stated that she has "great relationships with every one of" the panelists and Commissioner Carney testified that "had Ms. Pierce made [a] request [to reschedule], [it] would've been afforded to her." (*Id.* at 6:14–15, 153:25–154:1.) Pierce, however, never asked to have the interview rescheduled

because she was leaving for a vacation shortly after the interview "so there wasn't a whole lot of timeframe for to [sic] reschedule." (*Id.* at 6:20–25.)

Albandoz further confirmed that Pierce interviewed poorly—on account of illness as well as a negative attitude—and that Pierce knew it. She testified that Pierce was "kind of, upset before she went into the interview" because she thought the interview was a "setup." (Jan. 10 Tr. 176:25–177:1.) According to Albandoz, Pierce was also "very upset" after the interview and said, "this is a setup, I didn't do well, I was not feeling well." (*Id.* at 177:13–15.)

B

In support of her theory that race was a factor in the City's decision to not promote her, Pierce pointed to two emails and a letter from various City officials recommending Albandoz for positions other than the HSPA job. First, she cited to an email from City Councilwoman Maria Quiñones-Sanchez to Brian Abernathy, the City's former First Deputy Managing Director, which stated:

> Brian, as you finalize the selection of the Prison Commissioner, I wanted to bring your attention to a highly qualified Latina in the system. We have no high ranking Latino in the Prisons. . . . When I spoke with Mayor Kenney yesterday, we discussed how we really need to try to get his Latino appointments up. This may work.

(Trial Ex. 15.) Albandoz's resume was attached to the email. Abernathy forwarded the email to Carney, who responded, "Thanks and I have supervised Mrs. Albandoz." (*Id.*)

Second, Pierce relied on a letter to Abernathy from Rafaela Colon, one of former Mayor Rendell's employees:

> It has come to my attention that for several years now, the [PDP] has lacked Latino representation . . . . I am challenging the new city administration and its departments to utilize their position in city government to impact real change in diversity by appointing a qualified, competent, and

7

experienced Latino to the position of Deputy Commissioner for Restorative and Transitional Services. Furthermore, I strongly urge you and those in the respective departments to consider Ms. Jennifer Albandoz for the position. . . . I am a firm believer that the position should be filled with a person who knows the system and can navigate it with expertise . . . .

(Trial Ex. 16.) Abernathy forwarded the letter to Carney and asked her for a list of the highest-ranking Latino employees in the PDP. Delaney prepared a list, which Carney sent to Abernathy. Abernathy drafted a response to Colon's letter and sent the draft to Carney for review. The response stated, in part, "we will do what we can to promote Latinos within the confines of civil service regulations." (Trial Ex. 21.) Abernathy explained that this statement was meant "to telegraph to Ms. Colon that civil service is very restrictive and that there wasn't much that we could actually do to promote Latinos within that system." (Jan. 10 Tr. 44:21–23.)

Third, Pierce cited to an email to Carney from City Transition Director Steve Preston, inquiring whether Carney had "filled the position that [she] previously held in the prison system."[4] (Trial Ex. 24.) Albandoz's resume was attached to the email.

Carney told the jury that "[i]t's not uncommon for folks to forward recommendations and resumes on behalf of constituents . . . but [that] in no way influences [her] decision to fill the position." (Jan. 9 Tr. 136:11–14.) She continued, "Different council members send information and recommendation[s]. It's not important to me in making my decision. I'm looking to fill positions with the best qualified candidate . . . ." (Id. at 137:1–3.) Abernathy also testified that these sort of recommendations "happen[ ]all the time." (Jan. 10 Tr. 24:2.) He explained:

It is not something we encourage but we accept it as something that has and will continue to happen. . . . [T]o my knowledge I've not had a

---

[4]     Before her appointment to Commissioner, Carney served as the PDP's Deputy Commissioner of Restorative and Transitional Services. (Jan. 9 Tr. 98:15–20.)

8

> commissioner . . . feel pressured or feel obligated to place someone in a position just because they received [a] recommendation from city council or any, anyone else. What we have done is figured out how to maneuver through those issues and make sure that the council member feels that their recommendation was taken seriously, but there's been no sense of requirement or obligation to follow those recommendations.

(*Id.* at 24:2–4, 24:21–25:3.)

A reasonable jury could have credited Carney and Abernathy's testimony that the emails and letter from Quiñones-Sanchez, Colon and Preston did not influence Carney's decision to promote Albandoz to the HSPA position instead of Pierce. First and foremost, none of the recommendations were for the HSPA job. They were all for different (indeed higher-ranking) positions within the PDP. Pierce apparently wanted the jurors to conclude that because Carney, Abernathy and perhaps others disappointed Councilwoman Quiñones-Sanchez, Ms. Colon and Mr. Preston by *not* awarding Albandoz the jobs which were the subjects of their requests, Carney, Abernathy, *et al.* orchestrated Albandoz's promotion to the HSPA position to mollify Albandoz's supporters. The jurors apparently didn't see it that way, a view that was not controverted by the evidence.

### C

Pierce's strongest argument that race played a role in the decision to promote Albandoz to the HSPA job depended on the extent, if any, to which the jurors were going to credit the testimony of former PDP Deputy Commissioner Robert Tomaszewski. Before Tomaszewski took the stand, Pierce told the jury about a conversation she had with him:

> [He] told me that he basically knew why I didn't get the position . . . that he knew that the city was looking to promote Latinos, he told me he had a conversation with Commissioner Carney and that during that conversation

Commissioner Carney had shared with him that she was getting pressure, she was not comfortable even making decision [sic] because I had more experience than Ms. Albandoz.

(Jan. 8 Tr. 64:11–17.)  Tomaszewski then augmented Pierce's story, testifying that Francine McCain, a social worker in the PDP, heard he had his own lawsuit against the City and asked him to meet with Pierce over lunch.  (Jan. 9 Tr. 221:16–222:8.)  He said that he told Pierce during that lunch that Carney "was being pressured to hire a Hispanic individual to the HSPA position."  (*Id.* at 222:15–17.)  For her part, Commissioner Carney testified that she was not pressured to promote a Hispanic candidate to the HSPA position and she denied ever telling Tomaszewski otherwise.  (Jan. 10 Tr. 257:16–21.)

The jurors learned that Tomaszewski is also suing the City for race and gender discrimination and is being represented in that litigation by the same lawyers representing Pierce.[5]  (Jan. 9 Tr. 223:5–22.)  The City drew attention to the fact that some of the exhibits Pierce offered into evidence had Tomaszewski's name printed on them, an indication of shared efforts between the litigants and their attorneys.  *See* (*id.* at 232:17–233:5; Trial Exs. 73, 84).  Pierce herself viewed her and Tomaszewski's cases as something of a team effort, telling Sergeant Miguel Rios, a PDP Office of Professional Compliance Investigator who did not sustain her internal hostile work environment claim, "don't worry, because I have Tomaszewski's lawyer."  (Jan. 10 Tr. 237:16–17.)

---

[5]  *Tomaszewski v. City of Philadeliphia*, No. 17-cv-4675 (E.D. Pa. Oct. 17, 2017), is assigned to Judge DuBois.

In sum, the only evidence that race played a role in the decision to promote

Albandoz was Tomaszewski's testimony, which Carney contradicted. The Court, in

denying Pierce's Rule 50 motion after the parties rested, described it in this way:

> The only testimony that . . . gets you there [on the discrimination claim], if
> anything, is Tomaszewski and Tomaszewski and his believability is within
> the purview of the jury. . . . [T]he Commissioner has denied [Tomaszewski's
> allegations] and the jury is going to decide who to believe. . . . [T]he jury
> heard a lot of evidence from which a reasonable juror could conclude that
> the decision was not based on race at all.

(Jan. 10 Tr. 275:16–25, 278:23–25.) At the end of the day, that is exactly what

happened. The jurors evaluated all of the evidence, including testimony by the

members of the interview panel and their interview notes, along with Pierce,

Tomaszewski and Carney's testimony. The jurors, as they were instructed to do,

assessed the credibility of all witnesses, including Tomaszewski and Carney—their

manner while testifying, whether they had an interest in the outcome of the case and

any other factors that bear on believability—and gave Tomaszewski's testimony the

weight they felt it deserved.

The jurors' verdict on the discrimination claim was firmly supported by the

evidence they saw and heard. Pierce still insists that she "presented to the jury

overwhelming undisputed evidence that race was a motivating factor in Defendant's

decision not to promote her to HSPA." (Mem. Supp. Mot. 10, ECF No. 86.) The jurors

saw and heard no such evidence.[6] If the jurors were presented anything that was

---

[6]     Pierce's lawyers misstate the evidence and strength of their case throughout their post-trial
briefing. *See* (Pl.'s Mem. Supp. Mot. 8, 10, ECF No. 86 ("The uncontroverted evidence presented in
this case establishes that race played a part in the minds [sic] of Defendant's decision-maker
concerning the position of HSPA. . . . [Plaintiff presented] overwhelming undisputed evidence that
race was a motivating factor in Defendant's decision not to promote her to HSPA."); Pl.'s Reply Supp.
Mot. 1–2, ECF No. 94 ("Plaintiff presented overwhelming undisputed evidence that the City
considered race throughout the decision-making process.")). These statements are false, factually,
legally and otherwise and they beg the question of just which trial counsel were actually watching.

"undisputed," it was that Pierce bombed the job interview that the "rule of two" required. She didn't feel well, she had a bad day and she went before the interview panel and laid an egg. She promptly admitted as much to her competitor for the position. She knew she could have asked to have the interview rescheduled, but she chose not to because she didn't want the interview to interfere with her vacation. That was her choice—she had every right to go through with the interview when she was not at her best. She now has to live with the consequences of the jurors' assessment of her performance that day and its effect on the City's decision to promote Albandoz instead. Drawing all reasonable inferences in the City's favor and disregarding all evidence favorable to Pierce that the jury was not required to believe, a reasonable jury would—and did—have a sufficient evidentiary basis to conclude that race was not a motivating factor in the City's decision to not promote Pierce.

III

The Court may grant a new trial under Federal Rule of Civil Procedure 59 "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). While the decision to grant a new trial is left almost entirely to the discretion of the district court, *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992), the scope of that discretion turns on whether the motion is based on a prejudicial error of law or on a verdict alleged to be against the weight of the evidence. *Burlington v. News Corp.*, 2016 WL 1221426 at *3 (E.D. Pa. Mar. 29, 2016) (citing *Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir. 1993)).

When the basis of the motion is the Court's evidentiary rulings or points for charge to the jury, the Court has wide latitude to grant or deny a new trial. *Id.* (citing

*Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 921–22 (3d Cir. 1986) and *Klein*, 992 F.2d at 1289–90). "The court must determine: (1) 'whether an error was in fact made;' and (2) 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'" *Id.* (citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989)).

The Court's discretion is narrower where a party alleges that the verdict is against the weight of the evidence. *Id.* (citing *Klein*, 992 F.2d at 1290). "[I]t should do so only when 'the great weight of the evidence cuts against the verdict and a miscarriage of justice would result if the verdict were to stand.'" *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) and citing *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352–53 (3d Cir. 1991) (new trial should be granted only where the verdict "cries out to be overturned" or "shocks [the] conscience")). The Court's power is "limited 'to ensure that it does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury.'" *Id.* (quoting *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996)).

Pierce believes the jury's verdict was against the weight of the evidence as to whether race was a motivating or determinative factor in the City's decision to not promote her, whether the City is liable under 42 U.S.C. § 1983 and whether she suffered actual injury from retaliation. She also contends a new trial is warranted because: (1) the Court erred when it wouldn't allow Pierce to depose Mayor Kenney after discovery had ended, (2) the City's counsel made improper statements during closing argument, (3) the Court erred when it held that evidence suggesting that

Carney was promoted on the basis of race (the issue before Judge DuBois in the *Tomaszewski* case) was inadmissible, (4) the Court erred when it admitted evidence that Pierce believes she was discriminated against when she was not promoted in 2015 and (5) the jury instructions and verdict form should have asked the jurors to consider whether Pierce was discriminated against on the basis of "her race (non-Hispanic)," rather than "her race."

A

i

The great weight of the evidence does not cut against the jury's verdict that race was not a motivating or determinative factor in the City's decision to not promote her. In support of her motion for a new trial, Pierce makes essentially the same arguments as in her motion for judgment as a matter of law. As discussed in Section II, *supra*, the jury's verdict on the discrimination claims was firmly supported by the evidence it saw and heard during trial. The Court cannot grant a new trial simply because a jury could have weighed the evidence differently—*i.e.*, by perhaps giving more credit to Robert Tomaszewski's testimony and less to that of Commissioner Carney and the other members of the City interview panel.

ii

Pierce is not entitled to a new trial on municipal liability, either. To hold the City liable under § 1983, Pierce was required to show both that the City deprived her of a federal right and that it did so pursuant to municipal policy or custom. Because the jury reasonably found that Pierce was not discriminated against on the basis of race,

she is not entitled to a new trial on the second prong of the inquiry, whether the City

had a policy or custom of discrimination.[7]

iii

Finally, the jury's decision to award Pierce nominal damages on her retaliation

claims is not against the weight of the evidence. At trial, Pierce argued that the City

---

[7]      Even if Pierce had established that she was discriminated against on the basis of race, she would not be entitled to a new trial as to whether the City had a policy or custom of discrimination. Pierce relied on the testimony of four people—Delaney, Abernathy, Resnick and Tomaszewski—to establish that the City had such a policy or custom.

     The jurors learned that during her deposition, Delaney stated that the City has had a policy of considering race in personnel decisions since Mayor Kenney took office. (Jan. 9 Tr. 69:24–71:13.) At trial, Delaney clarified that she first believed the City had this policy after she heard the City's Chief Diversity and Inclusion Officer, Nolan Atkinson, speak during a meeting in October of 2017. (*Id.* at 71:13–18, 88:1–7.) She testified that in the spring of 2016, when Pierce applied for the HSPA position, she did not have any information regarding the City's purported "Diversity Initiative." (*Id.* at 88:8–13.)

     Abernathy stated during his deposition that there is a "lens of diversity in [the City's] hiring process." (Jan. 10 Tr. 17:19–20.) At trial, Abernathy admitted that his language during the deposition was "imprecise." (*Id.* at 17:24.) He testified that the Kenney administration has an "emphasis on making sure that we have a diverse workforce," but to his knowledge, those who make hiring decisions for the City do not take race into account in any way. (*Id.* at 16:10–12, 22:4–8.)

     Resnick stated during his deposition that he thought the City was considering race in personnel decisions once Mayor Kenney took office. (*Id.* at 144:20–25.) At trial, Resnick testified that "when [Mayor Kenney] came into office, he made comments about [how] he wanted to have a diverse workforce and wanted to look like the city, the citizens in the city," but within the PDP, "somebody's race did not decide whether they got a job or not." (*Id.* at 143:15–16, 144:1–3.)

     Tomaszewski told the jury that he believes the City has a policy of considering race in personnel decisions. (Jan. 9 Tr. 214:19–22.) He stated that Carney has "ask[ed] [the PDP's] HR division for race and gender of individuals before they were hired." (*Id.* at 214:24–215:1.) Carney testified that she "do[es] not consider race when making decisions for hiring," (*id.* at 165:2–3), and that although the City collects applicants' demographic information, she does not have access to it when making hiring decisions. (*Id.* at 169:2–7.) She testified that on one occasion, Delaney provided her with applicants' demographic information prior to making a hiring decision, and this was a "violat[ion] [of] the EEO policy and the City's policy" and "out of line." (*Id.* at 165:1–3.)

     Tomaszewski also testified that he once recommended an Indian man for an open position in the PDP's MIS Department; according to him, Carney stated, "there's too many Indians at MIS" and asked if there were any Black female candidates he could consider instead. (*Id.* at 236:9–237:1, 239:7–240:11.) Carney testified that this conversation never occurred. (Jan. 10, 2019 Hr'g Tr. 260:1–3.)

     The "great weight" of all this testimony does not cut against the jury's verdict that the City does not have a policy or custom of considering race in personnel decisions. Again, the jurors assessed the credibility of each witness and they were free to assign little weight to the inconsistencies in Delaney, Abernathy and Resnick's testimony about the City's policy, and for reasons stated earlier, *see supra* Section II.C, the jury had a basis to discredit Tomaszewski and accept Carney's version of the facts.

15

retaliated against her by issuing two Employee Violation Reports in 2017 and 2018, subjecting her to a retaliatory hostile work environment by treating her in a more dismissive manner than other employees and denying her support staff, overtime and lunch breaks.

Pierce testified that when Albandoz issued her an Employee Violation Report in 2017:

> It affected me horribly. I had never been so scared in my entire life. I had never had my job put on the line or recommended to be terminated. I, I was having a really, really hard time functioning. I believe around the same time I actually started my family medical leave. It was just an absolutely horrible three months of waiting to find out what was going to happen. . . . I was suffering from anxiety, depression, headaches, [and] horrible stress which was aggravating my irritable bowel symptoms.

(Jan. 8 Tr. 74:7–19.) She also stated:

> I have been having severe panic attacks, chest pains, to the point where I have thought I was having a heart attack. . . . And, all of this is because I felt that Ms.—because Ms. Albandoz was harassing me. I've been taking medication and seeing a therapist. Or, was seeing a therapist at that time.

(*Id.* at 87:16–21.) With respect to the second Employee Violation Report, Pierce said, "It affected me worse than . . . the first time because now I'm feeling, okay, they're really coming after me." (*Id.* at 101:10–14.)

Pierce also testified before Albandoz was promoted, she "saw [her] future pretty successful" at the PDP, but now, "I don't see a—much of a future at the prisons . . . I feel that my, my upward growth has been stopped . . . . I don't feel that I have any upward mobility left." (Jan. 8 Tr. 111:20–112:8.) When asked what has been "the worst part of all th[is]," at the end of her direct examination, Pierce said:

> . . . [T]he whole thing has been the worst, worst I've ever experienced or really been through in my life to, to the mental health part, the depression, anxiety. . . . It just really took a toll on me physically and I felt hopeless, I

still feel hopeless. . . . I think what has, what has been the hardest part and the worst part of this for me and I'll be honest has been being away from my family and being away from my children. I have been absent for almost two years because I have just not been able to interact with my family, I've not been able to do things with my kids because I've been depressed. Because I feel like I'm a burden because people are always wondering how I'm feeling, so I can't get that time back. . . . I've missed so much of [my children's] lives, I can't get that time back. . . . I'm hoping to make a change, but I can't get that time back . . . .

(*Id.* at 112:12–114:1.)

Pierce's wife, Roberta Sellack, testified that when Pierce did not receive the HSPA promotion, "she started coming home and she would be frustrated . . . she just seemed depressed." (Jan. 10, 2019 Hr'g Tr. 49:7–11.) Sellack said that Pierce "[a]t some point . . . realized how unhealthy this was and she decided to get help." (*Id.* at 49:11–12.) Her doctor "put her on anxiety medication and she started seeing a therapist." (*Id.* at 49:13–14.) Sellack's only testimony pertaining specifically to Pierce's retaliation claims was that the Employee Violation Reports were "particularly stressful. [Pierce] was afraid . . . that she might lose her job. . . . [and] losing that job would've caused a pretty good financial hardship for us." (*Id.* at 50:16–51:6.)

To support her damages claim, Pierce introduced into evidence a health care provider form (Trial Ex. 90) on which Pierce's physician wrote that Pierce suffers from anxiety, depression and panic attacks which are "exacerbated while under supervision of Jennifer Albandoz." (*Id.*) Pierce submitted this form to the City along with a request to be transferred from Albandoz's supervision. (Jan. 8, 2019 Hr'g Tr. 89:21–25.) Pierce acknowledged on cross-examination, however, that she has been on blood pressure medication for seven years, has had irritable bowel syndrome for ten years and took

anxiety medication in 2012 for six or seven months, long before the retaliation began. (Jan. 9 Tr. 58:13–59:12.)

The Court has no reason to question the jurors' conclusion that Pierce failed to prove actual injury and accordingly award her one dollar. The jury was properly instructed to consider all evidence and decide what weight, if any, to assign to it.[8] With respect to Pierce's health care provider form, it was within the jury's province to give little or no weight to the unidentified physician's statements. Reasonable jurors could have also discredited Pierce and Sellack's testimony and the Court will not substitute its judgment for theirs. *See Walton v. City of Phila.*, 1998 WL 633676 at *4 (E.D. Pa. Aug. 17, 1998), *aff'd*, 182 F.3d 905 (3d Cir. 1999) (denying motion for new trial after jury awarded no damages because the jury could have disbelieved witness testimony, "even if that testimony was uncontroverted"); *Jackson & Coker, Inc. v. Lynam*, 840 F. Supp. 1040, 1050 (E.D. Pa. 1993), *aff'd*, 31 F.3d 1172 (3d Cir. 1994) (denying motion for new trial after jury awarded no damages where "a reasonable jury could have rejected

---

[8]     The Court instructed:

> If you find by a preponderance of the evidence that the city intentionally . . . retaliated against [Pierce] then you must consider the issue of compensatory damages. . . . Ms. Pierce is not entitled to damages for an injury unless the, the City's . . . retaliatory actions or omissions actually played a substantial part in bringing about that injury. . . . [Y]ou should be guided by common sense. You must use sound judgment . . . drawing reasonable inferences from the facts in evidence. . . . You may award damages for any pain, suffering, inconvenience, mental anguish, or loss or enjoyment of life that Ms. Pierce experienced as a consequence of the City's alleged . . . retaliation. No evidence of the monetary value of such intangible things as pain and suffering has been or need be introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damage. Any award you make should be fair in light of the evidence presented at trial. . . . [If] you return a verdict for Ms. Pierce but she has failed to prove actual injury and therefore is not entitled to compensatory damages, then you must award nominal damages of one dollar.

(Jan. 11 Tr. 112:6–114:15.)

the testimony of a party and concluded that the [plaintiff] did not, in fact, suffer any emotional damage").

B

i

Pierce argues that the Court erred when it would not let her depose Mayor Kenney and that this error warrants a new trial.  On October 2, 2018, after the close of discovery, Pierce's counsel asked the Court for permission to depose Mayor Kenney, Councilwoman Quiñones-Sanchez, Steve Preston and Brian Abernathy and to re-depose Commissioner Carney.  Counsel explained that the City had not provided before discovery closed the two emails and letter from Quiñones-Sanchez,[9] Colon and Preston recommending Albandoz for positions other than HSPA.

The City opposed Pierce's request.  After a telephone conference with counsel for both parties, the Court permitted counsel to depose Abernathy and re-depose Carney and limited the scope of the depositions to the two emails and letter.  (ECF No. 30.) The Court denied Pierce's request to depose Mayor Kenney, Quiñones-Sanchez and Preston.  *See* Fed. R. Civ. P. 26(c)(1)(A) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . forbidding the disclosure or discovery."); *see also Taggart v. Wells Fargo Home Mortg., Inc.*, 2012 WL 4462633 at *2 (E.D. Pa. Sept. 27, 2012) ("[C]ourts have significant discretion when resolving discovery disputes." (citing *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 778 (3d Cir. 2000)).

---

[9]     Quiñones-Sanchez's email to Abernathy stated, in pertinent part, "When I spoke with Mayor Kenney yesterday, we discussed how we really need to try to get his Latino appointments up."  (Trial Ex. 15.)

"Absent extraordinary circumstances, good cause exists to preclude the deposition of a high level government official because there is a public policy interest in ensuring that high level government officials are permitted to perform their official tasks without disruption or diversion." *Buono v. City of Newark*, 249 F.R.D. 469, 471 n.2 (D.N.J. 2008) (citing *Hankins v. City of Phila.*, 1996 WL 524334 *1 (E.D. Pa. Sept. 12, 1996)). The party seeking the deposition of a high ranking government official "must demonstrate that his testimony is likely to lead to the discovery of admissible evidence, is essential to that party's case and that this evidence is not available through any alternate source or less burdensome means." *Robinson v. City of Phila.*, 2006 WL 1147250 at *2 (E.D. Pa. Apr. 26, 2006) (citing *Hankins,* 1996 WL 524334 at *1).

Pierce did not seek Mayor Kenney's deposition until after the discovery deadline, when the City produced Quiñones-Sanchez's email—which, again, did not recommend that Albandoz be promoted to the HSPA position. *See* (Trial Ex. 15; Jan. 9 Tr. 106:14–107:6, 170:15–17; Jan. 10 Tr. 37:2–7). The email does not show that Mayor Kenney's testimony was likely to lead to the discovery of admissible evidence or that his testimony was essential (or for that matter, even relevant) to Pierce's case. The email does not, as Pierce's counsel now argues, "show that Mayor Kenney was directly involved in the promotion of Ms. Albandoz because of her race." (Pl.'s Reply Def.'s Mem. Opp'n 13, ECF No. 94.) It does not indicate that the Mayor was involved in any way in Albandoz's promotion to the HSPA job or that he had any other personal knowledge pertinent to Pierce's claims.

Pierce's request to depose the Mayor of Philadelphia with an argument that relied on a reed as thin as the Quiñones-Sanchez email seemed to the Court a

superficial attempt to harass the Mayor, and the trial confirmed the propriety of the Court's view.  Pierce did not present any evidence linking Mayor Kenney to her claims other than Quiñones-Sanchez's reference, pertaining to the Commissioner's job which Pierce never sought, and the Mayor's purported desire to increase his "Latino appointments" to high ranking PDP positions.  At trial, Commissioner Carney testified that she never communicated with Mayor Kenney about promoting Latino employees or about Jennifer Albandoz.  (Jan. 9 Tr. 172:1–6.)  Abernathy, who works "very closely" with the Mayor, said that he did not know who Albandoz was when he received Quiñones-Sanchez's email.  (Jan. 10 Tr. 7:2–4, 23:2–7.)  In short, Pierce presented no extraordinary circumstances justifying the Mayor's deposition and absent any evidence linking Mayor Kenney to the case, the Court protected the public interest by ensuring that the Mayor could perform his official tasks without disruption.

ii

Pierce argues that the City's counsel made improper statements during her closing argument and that those statements warrant a new trial.  Pierce contends specifically that it was inappropriate for counsel to: (1) refer in her closing to her own personal experience, (2) refer critically to Pierce's counsel and (3) discuss Mayor Kenney's absence from the trial.

1

First of all, counsel waived her right to now assert the first and second species of impropriety at trial and no exceptional circumstances justify a new trial on those grounds in any event.  "[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial."  *Burlington*, 2016 WL 1221426

at *8 (quoting *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998)). Courts consistently hold that a party's failure to object to the impropriety of closing remarks precludes the party from seeking a new trial on those grounds. *Id.* (collecting cases). The Court may still review the matter if "exceptional circumstances" exist—*e.g.*, where "manifest injustice would result" or where "counsel failed to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice." *Id.* (quoting *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 116 (3d Cir. 1992), *cert. denied*, 507 U.S. 1005 (1993)).

After making their closing arguments, counsel for both parties discussed Pierce's objections to the City's argument at sidebar. The Court, skeptical as to the bases for the objections, nonetheless told Pierce's counsel that if she could gather legal support for her positions over an impending break, he would further consider the objections before charging the jury. (Jan. 11 Tr. 89:24–90:5.) When the parties reconvened, the Court asked Pierce's counsel to state her objections to the City's closing argument on the record. (*Id.* at 90:19–20 ("Let's elaborate on your, your objection now. Take them again.").) Counsel objected to the City's reference to Mayor Kenney's absence from trial; the Court agreed that the City's counsel had gone too far in pointing out the Mayor's absence and told the parties he would give a curative instruction on that issue. (*Id.* at 90:22–91:22, 97:1–6.) Pierce's counsel then stated, "I will end my objections on that, Your Honor[,] the reference to the mayor. I, I think that, that was the one that is the most, you know, the prejudicial issue . . . ." (*Id.* at 90:23–91:1.) The Court asked again:

> Q: And that's . . . your only objection to the closing?
> A: Yes, your Honor.
> Q: You sure?
> A: Yes.

(*Id.* at 93:1–5.)

Pierce's counsel pursues in her post-trial briefing a curious argument purportedly intended to excuse her decision to forgo her other objections to the City's closing argument.  She now claims to have been rattled by the Court's "hostility" to her objections and, more specifically her own closing and rebuttal arguments to the jury.  (Reply Supp. Mot. 5, ECF No. 94; Reply Supp. Mot. Ex. C.)  Counsel confuses hostility with disappointment.

Going back to the rule of two, the City was required to consider for the HSPA vacancy the two interested candidates with the highest civil service exam scores.  That initially meant that Dawn Hall, who is African-American, was Pierce's competition for the spot.  Ms. Hall, however withdrew from consideration shortly before the interview, elevating Albandoz to be considered, and interview against Pierce, because she had the next highest test score.  *See supra* Section II.A.  That fact, of course, constituted a significant challenge to Pierce's theory of the case, which was that the City effectively jerry-rigged the entire process to get Albandoz into position for the interview panel to recommend her and Commissioner Carney to promote her.

To get around this roadblock, Pierce's counsel crossed the line separating zealous advocacy from improper argument.  She told the jurors things for which not only there was no basis in the evidence at trial, but which counsel knew from the underlying discovery to be false.  Neither side called Ms. Hall to testify at trial.  Counsel, and the Court from its review of the record at the summary judgment stage, knew from the deposition testimony of both Pierce and Albandoz that Hall chose not to pursue the HSPA job for reasons completely unrelated to the City—and related solely to her child.

23

When deposed, Pierce testified Hall didn't want the job because "I think it had something to do with her son, and not just wanting the responsibility, and the hours." (Pl.'s Resp. Summ. J. Ex. A ("Pierce Dep.") 66:7–9, ECF No. 40-2.)  Albandoz echoed that, stating in her deposition that Hall ". . . said because of the reasons of her son and because of so much work that needs to be done at HSPA she would not have the time to be actually with her son.  So she was going to withdraw the position."  (Def.'s Mot. Summ J. Ex. M ("Albandoz Dep.") 55:9–13, ECF No. 34.)

Such an innocuous narrative was not going to suffice, so Pierce's lawyer simply changed it.  In her closing argument, she said:

> Ms. Pierce is number two and Ms. Albandoz is number four [on the civil service list].  Ms. Albandoz wasn't even in the running when that [HSPA] position became available.  It should've been Ms. Pierce verse [sic] Ms. Hall, Ms. Hall was number three.  Ms. Hall is not Hispanic and somehow, curiously, Ms. Hall declined that job right before the interviews which pushed Ms. Albandoz into the running.

(Jan. 11 Tr. 55:22–56:3.)  She went even further in her rebuttal, stating, "[Hall] was on the fence and then at some point she was pushed off the fence at the last minute.  And the Defendant doesn't have an explanation for that."[10]  (*Id.* at 84:8–10.)

The Court (at sidebar out of the hearing of the jury and later while the jurors were not in the courtroom) admonished counsel for her tactics and, perhaps worse, for arguing that her conduct was appropriate—something she continues to do.  *See* (Reply Supp. Mot. 9, ECF No. 94 ("Plaintiff's counsel inference was *properly* made based on the facts and testimony at trial and Ms. Hall's failure to testify." (emphasis in original))).  The Court tried to give counsel an out, telling her when she continued to defend the

---

[10]     Of course, if that was her theory, it was Pierce's burden to show that the City nefariously "pushed" Hall out of the picture—it wasn't up to the City to "explain" why Ms. Hall withdrew from contention.

indefensible that "I think the best thing you can do is say, Your Honor, I wanted to win really bad and I went too far and I'm sorry and I won't do it again." (Jan. 11 Tr. 94:19–21.) It was good advice and she should have taken it.

2

Even if Pierce had preserved her objections, the City's counsel's references to personal experience and Pierce's counsel would not warrant a new trial. "[I]mproper comments during closing arguments rarely rise to the level of reversible error." *Dunn v. HOVIC*, 1 F.3d 1371, 1377 (3d Cir.), *modified*, 13 F.3d 58 (3d Cir. 1993) (quoting *Littlefield v. McGuffey*, 954 F.2d 1337, 1346 (7th Cir. 1992)). The Court has "considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial." *Draper v. Airco, Inc*., 580 F.2d 91, 94 (3d Cir. 1978). "[N]ot all improper remarks will engender sufficient prejudice to mandate the granting of a new trial. Our test is whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Indus., Inc*., 980 F.2d 171, 207 (3d Cir. 1992) (quoting *Draper*, 580 F.2d at 97). "Often . . . a combination of improper remarks are required" to show prejudicial impact; a new trial is "compelled by the argument as a whole rather than a single instance or type of impropriety." *Id*. at 207–08 (citations omitted).

Counsel for the City referred to her own experience as a person of color twice during closing argument:

> Like Ms. Pierce I was ten years out from my Master's degree, I had ten years' worth of work experience in the field, and I knew that my background would make me perfect for that job. So, I went into the job interview . . . no one [looked like me—African-American], and that was okay. . . . Shortly after my interview I got the notice . . . I was not selected. I had two choices at that point. My first choice was to be introspective, I needed to zero in on

what—why I didn't get the position so that I could get the next one. . . .
Second choice was to put the blame on the people in the room that didn't
look like me, that would've been easy. But when you blame others, you fail
to learn from your mistakes. And, that's what happened to the Plaintiff.

(Jan. 11 Tr. 58:17–59:12.)

I wake up every day, I'm African-American, does that mean that whenever
I go into the world and I see another African-American I have a hidden
motive or some sort of signal that has poisoned my decisions as it relates to
them or if I see someone else that's not African-American do I somehow
disfavor him because of that[,] because I drank from . . . the poisonous pot,
no.

(*Id.* at 64:6–12.)

Counsel also made references to Pierce's lawyers:

 . . . [Tomaszewski] has his own case going against the City of Philadelphia
right now claiming that he was discriminated against based on race. And
you know who his attorneys are? Right here, his attorneys here, right here.
A good number of the documents the Plaintiff even has came from Mr.
Tomaszewski and you noticed that the bottom of the paper, when you get
back into that room, look through the exhibits. If you see Tomaszewski at
the bottom, that's because we didn't provide them. They came from the
Plaintiff's attorney when they represented him.

(*Id.* at 64:25–65:9.) Counsel continued, "So, if there's any infection of the mind it's . . .

Tomaszewski, the Plaintiff, and her attorneys who all stand to gain 'cause if he wins

this case they win, if she wins her case they . . . [w]in." (*Id.* at 68:2–8.) Counsel then

argued: "Plaintiff has chosen to view [the City's] acts as retaliation because of her team.

Her attorneys are working to make sure that the lens that she sees all these actions

are—is a retaliatory lens." (*Id.* at 77:24–78:2.)

Even if counsel's statements, particularly her references to personal experiences,

arguably "crossed the line" between proper and improper argument, *see Fineman*, 980

F.2d at 209 (affirming grant of new trial where counsel, *inter alia*, "improperly provided

his personal opinion as to the justness of his cause and injected his own credibility as

an issue in the case" and made "vituperative references to opposing counsel"), the statements were not "so severe as to warrant a new trial." *Forrest v. Beloit Corp.,* 424 F.3d 344, 352 (3d Cir. 2005); *see also Dunn,* 1 F.3d at 1377 ("[O]ur disapproval of portions of the closing is not enough to warrant reversal on that ground."). This is not a case in which the "cumulative thrust of . . . counsel's argument" was improper, or one in which a "wealth of questionable remarks [were] made." *Draper*, 580 F.2d at 95; *Fineman*, 980 F.2d at 211. It is not reasonably probable, considering the City's closing argument as a whole, that the jury's verdict was influenced by two references to counsel's personal experiences and one allegedly "vituperative" reference to Pierce's counsel.[11] On the contrary, the basis for the jury's verdict appeared to rest on the absence, in their view, of any evidence that race was a motivating factor in the City's decision to promote Albandoz instead of Pierce. *See supra* Section II.C.

### 3

Pierce did preserve her objection to the City's reference to Mayor Kenney. In its closing, the City drew the jury's attention to the Mayor's absence from trial:

> [O]ne of the things that [Plaintiff] said was, the mayor and the councilwoman [Quiñones-Sanchez] got together and decided they wanted to promote Jennifer Albandoz. Now, did you hear any testimony from the mayor? Certainly, if the mayor had decided he wanted to promote Jennifer Albandoz because she's Hispanic, we would've had him on the stand. Plaintiff has been very thorough in excavating all of the information that is relevant to her case. You didn't hear from the mayor[,] did you? That's because the mayor does not know Jennifer Albandoz.

---

[11]     Indeed, the statement regarding Pierce's counsel's "retaliatory lens" pertains only to Pierce's retaliation claims, which the jury upheld. It is thus improbable—if not impossible—that this statement influenced the verdict. In any event, the City's characterization of Pierce's counsel as her "team" was based upon evidence of shared efforts between Tomaszewski, Pierce and their attorneys.

(Jan. 11 Tr. 62:13–21.)  The Court, in light of its ruling prohibiting Pierce from deposing the Mayor, instructed the jurors to disregard this comment.[12]

Again, although this statement was improper, it is not reasonably probable that it had any influence on the jury's verdict.  The "cumulative thrust" of the City's closing was not an invitation to draw inferences from the Mayor's absence.  Instead, the comment about the Mayor was isolated and promptly cured by the Court's instruction.

### iii

Before trial, the City moved to exclude "all testimony and evidence regarding rumors, innuendos, or gossip about the City's alleged discriminatory hiring practices pertaining to" Blanche Carney's appointment to PDP Commissioner.  (ECF No. 47 at 8.) During oral argument on the motion, Pierce argued that evidence of the alleged discriminatory nature of Carney's appointment is relevant to show that the City has a policy or custom of considering race in personnel decisions.  (Jan. 3, 2019 Hr'g Tr. ("Jan. 3 Tr.") 16:25–17:2.)  Pierce's counsel told the Court that, if permitted to do so, Abernathy and Resnick would testify that they discussed the City's desire to appoint an

---

[12]    After closing arguments, the Court instructed the jury:

> [Y]ou will recall that in my initial instructions to you I talked about . . . what is not evidence, and statements and arguments by the attorneys are not evidence. . . .  In, in closing there were statements to the effect of the Plaintiff not having Mayor Kenney here to testify.  You are to disregard that reference to Mayor Kenney and put it out of your mind.

(Jan. 11 Tr. 97:11–20.)  The Third Circuit Court of Appeals "presume[s] that jurors follow the instructions given to them by the trial court."  *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 191 (3d Cir. 2019) (citing *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014)).  "That presumption is only overcome where there is an 'overwhelming probability' that the jury was unable to follow the instructions and a likelihood that the evidence wrongfully admitted was 'devastating' to the other party."  *Id.* (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).  There is no evidence that the jury considered the reference to the Mayor's absence after receiving this curative instruction and an instruction that counsel's statements are not evidence.  Nor is there a likelihood, given the complete lack of evidence that the Mayor was involved in any way in the HSPA promotion decision, that the jury's consideration of the Mayor's absence would have been devastating, or even harmful at all, to Pierce.

African-American female to the Commissioner position before Carney was asked to interview. (*Id.* at 18:20–19:1.)

As discussed in Section III.A.ii, *supra*, Pierce is not entitled to a new trial on whether the City discriminated against Pierce pursuant to a policy or custom because the jury reasonably found that race was not a motivating factor in the decision to not promote her. Accordingly, Pierce's claim that the Court erred when it excluded evidence probative of a policy or custom of discrimination is not grounds for a new trial.

Regardless, the Court properly excluded the evidence under Federal Rule of Evidence 403. This was an issue tailor made for that Rule. The purported probative value of the evidence—an African-American woman's appointment to PDP Commissioner over a white man—to Pierce's claim that the City has a policy or custom of considering race in hiring decisions is minimal at best. It was also substantially outweighed by Rule 403's express considerations. It would have necessitated a mini-trial on Tomaszewski's separately filed discrimination case because the City would have had to be allowed to explain why Carney was promoted over Tomaszewski. The process by which Carney was appointed was "completely different" than the civil service rule of two appointment procedure for the HSPA job. *See* (Jan. 3 Tr. 20:10–17). The undue delay, confusion of the issues and waste of time, among other things, inherent in allowing this entirely separate debate to play out were obvious.

The Court could not, consistent with Rule 403, allow Pierce's counsel to turn her trial into a trial on Tomaszewski's discrimination claims. (*Id.* at 20:18–21.) The Court instructed counsel that Tomaszewski could testify that he brought discrimination claims against the City, but not that he believes Carney was appointed on the basis of

race.  (*Id.* at 21:7–12); *see also* (*id.* at 27:7–10).  If evidence of the alleged discriminatory nature of Carney's appointment was admitted, the Court observed, the jury would be "wondering whose case we're trying."  (*Id.* at 28:1–2.)  In sum, the Court ruled that "any relevance with respect to the *Monell* claim is in my view, going to be greatly outweighed by jury confusion, unfair prejudice, and the time that [the City] is going to need to explain why they hired Carney."  (*Id.* at 28:5–8.)

iv

Before trial, Pierce moved to exclude "evidence related to Plaintiff's withdrawn claim of race [discrimination] pertaining to [the City's] failure to promote [her] to the HSPA position in 2015."  (ECF No. 49. ("Plaintiff's withdrawal of her claim has nothing to do with her remaining claims of discrimination, harassment and retaliation. Specifically, Ms. Pierce's decision not to pursue this claim in no way relates to her ability to prove her remaining claims.").)  During oral argument on the motion, the City clarified that it would not offer evidence "that [Pierce] had a claim [regarding the 2015 promotion] and withdrew it," (Jan. 3 Tr. 41:9), but would "simply hav[e] plaintiff testify that she believes she didn't get [the 2015 promotion] because she was discriminated against by the City."  (*Id.* at 42:18–20.)  Pierce's counsel responded, "All right.  We'll take that.  If it ends there."  (*Id.* at 43:11–12.)

The Court discussed the acceptable parameters of this inquiry with all counsel on the record.  The Court noted that it was fair for the City to elicit that Pierce thought she should have received the 2015 HSPA promotion over Lyde even though Lyde scored higher on the civil service exam, given Pierce's belief that she should have been promoted over Albandoz for the other HSPA spot in 2016 in part because she scored

30

higher than Albandoz on the exam.  *See* (Jan. 8 Tr. 53:24).  The Court invited Pierce's

counsel to redirect Pierce on this issue and object during trial if any confusion arose

regarding "how this [evidence] is going to play out."  (Jan. 3 Tr. 49:10–25, 50:1–3.)

Pierce's counsel agreed to these parameters.  (*Id.* at 49:24–25, 50:4, 50:15–17.)

Ultimately, the Court granted Pierce's motion to exclude evidence of her withdrawn

discrimination claim.  (ECF No. 66.)

Pierce now moves for a new trial on the grounds that the Court should not have

permitted the City to elicit testimony that Pierce believes she was discriminated

against when she was not promoted in 2015.  On cross-examination, counsel for the

City asked Pierce:

> Q: . . . [Y]ou didn't receive the [2015] promotion?
> A: No, I did not receive the promotion.
> Q: And you didn't think the interview process was fair?
> A: I, I don't ever recall stating that I thought the interview process was
> unfair.
> Q: But you thought that they discriminated against you base on your race?
> A: Yes.
> . . .
> Q: Despite the fact that [Adrienne Lyde] was ranked number one and you
> were ranked number two [on the civil service exam], you believed you
> should have been promoted over her?
> A: Yes.
> . . .
> Q: And, this was the beginning of time [sic] that . . . you believe the City
> began discriminating against you, because you're Native American?
> A: This is the first time that I felt, yes.  I'm gonna answer, yes.

(Jan. 8 Tr. 118:20–119:5, 121:15–18, 123:1–6.)  Counsel later asked Pierce whether she

had filed an EEOC charge of discrimination regarding the 2015 promotion.  (Jan. 9 Tr.

12:2–5.)  Pierce answered, "Yes."  (*Id.*)  Pierce's counsel never objected, nor did she

redirect Pierce after her cross-examination.

A new trial would not be warranted even if Pierce had objected to the City's cross-examination.  The City's questions were well within the acceptable (and agreed upon by the parties) parameters of the City's inquiry into the 2015 promotion.  To Pierce, discrimination was the only possible explanation for losing out to Albandoz because Pierce viewed herself (the interview apparently notwithstanding) as far more qualified for the HSPA job.  Her purportedly superior qualifications of course included the fact that she scored higher on the civil service exam than Albandoz.  In 2015, however, her competitor for the first HSPA position, Adrienne Lyde, had the higher exam score—yet Pierce felt she was more qualified than Lyde.  The inherent contradiction in these positions was fair game for the City to point out.  Pierce's counsel did not disagree at the hearing on the motion *in limine* (which explains why counsel did not object to the questioning at trial) and she never redirected her client on the topic.

v

Finally, Pierce argues that the jury should have been instructed that Pierce claimed she was denied a promotion because of "her race (non-Hispanic)," rather than, as the Third Circuit's model instruction recommends, because of "her race."  She contends that the verdict form should have also included this language, in order to specify that she claimed she was not promoted because she is not Hispanic.  Pierce cites no legal support for her theory, but nonetheless argues that the Court made a "significant error of law."  (Pl.'s Mem. 23, ECF No. 86.)

Parties are entitled to jury instructions that "accurately and fairly set[ ] forth the current status of the law."  *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995) (citations omitted).  "No litigant has a right to a jury instruction of its choice, or

precisely in the manner and words of its own preference." *Id.* (citations omitted); *see also Price v. Trans Union, L.L.C.*, 839 F. Supp. 2d 785, 814 (E.D. Pa. 2012) ("Plaintiff's argument boils down to wishing she got the jury instruction she wanted, but the law does not require that the Court provide an instruction that meets with Plaintiff's approval.")

The jury was charged as follows:

> Ms. Pierce has made claims under state and federal laws that prohibit discrimination against an employee because of the person's race. . . . [S]he must prove that her race was a motivating factor in the City's decision to not promote Pierce to the Human Services Program Administrator Position. . . . Ms. Pierce may also prove that the City intentionally discriminated against her by proving that her race was a determinative factor in the City's decision to not promote her . . . .

(Jan. 11 Tr. 104:25–106:19.)  The Court, in formulating these instructions, relied on the Model Civil Jury Instructions for the District Courts of the Third Circuit.  *See* Third Circuit Court of Appeals Model Civil Jury Instruction 6.0 (2018) ("Plaintiff . . . has made a claim under the Federal Civil Rights statute that prohibits discrimination against [an employee] [an applicant for employment] because of the person's race."); *id.* at 5.1.1 ("[Plaintiff] must prove that [his/her] [protected status] was a motivating factor in [defendant's] decision to [describe action] [plaintiff]."); *id.* at 5.1.2 ("[Plaintiff] must prove that [his/her] [protected status] was a determinative factor in [defendant's] decision to [describe action] [plaintiff].").

While "a model jury instruction itself is neither law nor precedential" and does not "replace [courts' and parties'] shared obligation to distill the law correctly when drafting proposed jury instructions," adherence to the model instructions was proper in this case.  *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 191 (3d Cir.

2019); *but see United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010) ("We have a hard time concluding that the use of our own model jury instruction can constitute error . . . ."). The jury's charge, as well as the verdict form, matched not only the Third Circuit's model language, but the language of Pierce's own complaint, which alleged that the City discriminated against her "based on her race."[13] (Second Am. Compl. 1, ECF No. 18.)

Pierce pled and styled her case as she saw fit. The jury heard detailed testimony regarding her Native American heritage. (Jan. 8 Tr. 38:4–18.) Counsel elicited that when Carney made the decision to promote Pierce, she knew that Albandoz is Hispanic and Pierce is not. (Jan. 9 Tr. 163:110–14.) Pierce's lawyers were free to argue, as they did during their opening and closing statements, that Pierce was not selected for the HSPA job "because of her race because she is not Hispanic." (Jan. 8 Tr. 14:22–24; Jan. 11 Tr. 51:9–13.) There was no error in the Court's instructions or verdict form, much less an error so prejudicial to warrant a new trial.

## IV

### A

In a separate motion (ECF No. 78), Pierce asks the Court to order the City to remove her from Albandoz's supervision and place her under the supervision of Adrienne Lyde, while still allowing her to keep her staff, office and parking spot at the

---

[13] Plaintiff continued to advance this theory at summary judgment, arguing that she was entitled to judgment as a matter of law on the race discrimination claims because "Plaintiff's race was a motivating factor in Defendant's failure to promote her to the [HSPA] position." (Pl.'s Mem. Supp. Mot. Summ. J. 2–3, ECF No. 32-2); *see also* (*id.* at 1–2 ("Defendant . . . has discriminated on the basis of race against Plaintiff—a Native American woman—as part of Defendant's discriminatory hiring policies. . . . It is . . . undisputed that Ms. Pierce's race played a part in Defendant's decision not to promote her.").

Philadelphia Industrial Correctional Center.[14]  She submits that this relief will "make her whole" from the retaliation she suffered and deter future retaliation by the City.

"The purpose of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination."[15]  *James v. Norton*, 176 F. Supp. 2d 385, 388 (E.D. Pa. 2001) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)).  "The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed."  *Id.* (citing *Albemarle Paper Co.*, 422 U.S. at 419).  Title VII vests in federal courts "broad equitable discretion" to order appropriate equitable relief, *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976), and courts must strive to grant "the most complete relief possible."  *Id.* at 764 (citation omitted).  In determining what sort of relief to grant, courts must be guided by "the central goals of make-whole relief and deterrence."  *Squires v. Bonser*, 54 F.3d 168, 172 (3d Cir. 1995).

Pierce relies on *James v. Norton*, 176 F. Supp. 2d 385, 388 (E.D. Pa. 2001), for the proposition that Title VII gives courts the authority to order an employer to promote an employee or reclassify the employee's position.  In *James*, a jury found that the plaintiff had been discriminated against on the basis of gender when his employer failed to increase his employment grade level at the Independence National Historic

---

[14]     Jennifer Albandoz and Adrienne Lyde are both HSPAs in the PDP.  Albandoz supervises all social work supervisors, except those assigned to the Curran-Fromhold Correctional Facility.  (Def.'s Resp. Opp'n Mot. 3, ECF No. 79.)  The social work supervisors at CFCF are supervised by Adrienne Lyde.  (*Id.*)  According to Pierce, one social work supervisor, Eileen Pitt, works at PICC but reports to Lyde.  (Pl.'s Reply Supp. Mot. Ex. C ("Pierce Decl.") ¶ 10.)

[15]     Title VII provides that if a defendant intentionally engaged in or is intentionally engaging in an unlawful employment practice, "the court may . . . order such affirmative action as may be appropriate, which may include . . . equitable relief as the court deems appropriate."  42 U.S.C. § 2000e–5(g)(1).  The PHRA and the PFPO contain similar provisions.  *See* 43 Pa. Cons. Stat. § 962(3); Phila., Pa., Code § 9-1122(3)(e).

Park. 176 F. Supp. 2d at 387. The court granted the plaintiff equitable relief, ordering the employer to upgrade his grade-level position—"exactly the kind of make-whole relief envisioned by Title VII." *Id.* at 392.

The City correctly argues that Pierce's request is not the sort of "make-whole" relief contemplated by Title VII and *James* because it would not place Pierce in the position she would have occupied had the retaliation not occurred. At trial, the jurors awarded Pierce one dollar in nominal damages on her retaliation claims, an award which demonstrates that Pierce failed to establish that she suffered any actual injury from the City's retaliation. *See supra* Section III.A.iii; (Verdict Form 3, ECF No. 73). In these circumstances, it would be inappropriate for the Court to "revamp the PDP social work organizational structure" in recognition of Pierce's right to be free from retaliation, (Def.'s Mem. Opp'n Pl.'s Mot., 1–2, ECF No. 79), particularly in light of the City's long-standing offer to transfer Pierce to the Curran-Fromhold Correctional Facility to be supervised by Lyde.[16] *See* (Def.'s Resp. Opp'n Mot. 8, ECF No. 79.)

B

Pierce also asks the Court to permanently enjoin the City from retaliating against her.[17] "[T]hroughout its history, Title VII has provided for injunctions to bar like discrimination in the future, an important form of relief." *Burlington N. & Santa*

---

[16] Pierce has resisted moving from PICC to CFCF up to this point because she would "inherit all new staff," "lose [her] large office in PICC" and "lose [her] close parking space." (Pl.'s Reply Supp. Mot. Ex. C ("Pierce Decl.") ¶ 10.)

[17] Title VII provides that the court "may enjoin the [defendant] from engaging in" an unlawful employment practice if it intentionally engaged in or is intentionally engaging in such practice. 42 U.S.C. § 2000e–5(g)(1). The PHRA provides that if the defendant has engaged in or is engaging in an unlawful discriminatory practice, "the court shall enjoin [it]" from engaging in such practice." 43 Pa. Cons. Stat. § 962(3). The PFPO similarly provides that the court "may grant any relief it deems appropriate . . . including injunctive relief." Phila., Pa., Code § 9-1122(3)(e).

*Fe Ry. Co. v. White*, 548 U.S. 53, 72 (2006) (internal citation and quotation marks omitted). A party moving for such an injunction must show (1) she has suffered irreparable injury, (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Yarnall v. The Phila. Sch. Dist.*, 180 F. Supp. 3d 366, 370 n.6 (E.D. Pa. 2016) (finding that courts "routinely utilize[ ]" *eBay*'s four-factor test in the Title VII context). The Court's "necessary determination is that there exists some cognizable danger of recurrent violation." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953).

A broad order enjoining the City from retaliating against Pierce is not appropriate in this case. *See Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994) (citing *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir.1987)) ("Broad, non-specific language that merely enjoins a party to obey the law . . . does not give the restrained party fair notice of what conduct will risk contempt."). Pierce submits that her irreparable injury, for purposes of this Motion, is the violation of her right to be free from retaliation. She fails, however, to show that remedies available at law are inadequate to compensate her for that injury. The jury's award of nominal damages does not indicate that damages would have been an inadequate form of relief; rather, it demonstrates the jurors' view that Pierce suffered no compensable injury at all. Moreover, the danger of recurrent violation is

speculative, particularly where the City has offered to work with Pierce to prevent future violations by transferring her to Lyde's supervision.

V

Finally, Pierce moves for a new trial under Federal Rule of Civil Procedure 60(b)(3) on the grounds that the City withheld evidence it was obligated to produce during discovery. Under Rule 60(b)(3), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3).

Relief under Rule 60(b) "should be granted only where extraordinary justifying circumstances are present." *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (quoting *Plisco v. Union R. Co.*, 379 F.2d 15, 17 (3d Cir. 1967), *cert. denied*, 389 U.S. 1014 (1967)). The moving party "bears a heavy burden" to establish that her opponent "engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting [her] case." *Id*; *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983). *See also Floorgraphics Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 434 F. App'x 109, 111 (3d Cir. 2011) ("[R]elief under Rule 60(b)(3) may be warranted, even though the newly disclosed evidence may not change the result, if such evidence 'would have made a difference' in advancing the moving party's claim." (quoting *Seaboldt v. Pa. R.R. Co.*, 290 F.2d 296, 299 (3d Cir. 1961)). Evidence to support a new trial under Rule 60(b)(3) must be clear and convincing. *Price v. Trans Union, L.L.C.*, 839 F. Supp. 2d 785, 799 (E.D. Pa. 2012) (quoting *Brown v. Pa. R.R. Co.*, 282 F.2d 522, 527 (3d Cir. 1960)). Pierce believes the City's purported misconduct

prevented her from showing that the City considers race in hiring decisions and focuses on the percentage of Hispanic employees in the PDP. She also claims that the City's alleged withholding of evidence hindered her ability to impeach the credibility of key witnesses at trial and that the evidence ran counter to the City's closing argument. A new trial is not warranted because, to the extent the recently discovered evidence is even relevant to Pierce's claims, it is cumulative of other evidence which Pierce's lawyers chose, for whatever reasons, not to introduce at trial.

In Pierce's third set of requests for production of documents, served on August 8, 2018, Pierce asked the City for all emails to, from, created or received by certain City employees containing the terms "diverse," "diversity," "quota," "racial," "minority," "applicant pool," "latino" and "demographic." (Pl.'s Mot. New Trial Exs. A–C, ECF No. 101.) The City submits that on September 21 and 24, 2018, it produced 661 documents in response. (Def.'s Mem. Opp'n Pl.'s Mot. New Trial 4, ECF No. 103.) Meanwhile, Pierce's counsel was preparing to conduct discovery for Robert Tomaszewski's case against the City.[18] On February 26, 2019, in response to a request for production in that case, Pierce's counsel received several emails it believes should have been produced in response to Pierce's August 8 request:

- March 8, 2016 email chain between Steve Preston, Jane Slusser and Brian Abernathy regarding the vacant PDP Commissioner position. Abernathy asks "why we haven't considered Blanche Carney—she's a current Deputy. African American woman. Well respected in the system. Similar experience to Darcella." Preston states, "there's

---

[18]    *See supra* note 5.

another candidate—Oscar Aviles, who is a latino guy, who we should maybe consider interviewing also . . . ." (Pl.'s Mot. New Trial Ex. G.)[19]

- December 12, 2016 email from Preston to ShaRonn Mitchell and Nolan Atkinson. Preston writes, "We're going to be presenting monthly diversity reports to the Mayor each month" and outlines a "hiring diversity process": "Nolan calls Hiring Manager if diverse candidates aren't being interviewed," someone "sends over report of new exempt hires every 2 weeks" and "Nolan follows up with departments after hiring non-diverse candidates to see what process was used." (*Id.* at Ex. H.)

- March 29, 2018 email from Atkinson to Slusser. Attached is a document dated April 2, 2018 that lists "a series of key ideas . . . for the purpose of collaboratively establishing exempt workforce diversity metric targets for FY 19" and states there is "an underrepresentation of African Americans, Asians and Latinos (hereinafter collectively referred to as 'underrepresented people of color') in the City's exempt workforce." (*Id.* at Ex. I.)

- July 26, 2018 email from Preston to Atkinson and Brenna Schmidt, Atkinson's executive assistant, responding to an email from Atkinson on the same date. Atkinson's email states in pertinent part, "Following the two hour sessions that we spent discussing how we can increase the exempt workforce with talented underrepresented minorities, I wanted to provide you with next steps in our goal setting process. We would like you to . . . develop a recommended goal for increasing the number of underrepresented minorities in you [sic] cabinet or subcabinet cluster. Your goal should specifically apply to increasing the percentage of Black or African American, Hispanic or Latino, or Asian exempt employees . . . ." (*Id.* at Ex. D.)

- (A) August 3, 2018 email from Slusser to Schmidt forwarding an email from Catherine Califano to Atkinson, Slusser and Anne Fadullon on the same date. Califano's email attaches a document charting "FY 18 Diversity Metrics"—the percentage of White, African American, Hispanic/Latino and Asian exempt employees and new hires—and "FY 19 Proposed Goals" for increasing those percentages. (*Id.* at Ex. E.)
  (B) September 11, 2018 email from Stephanie Tipton to Schmidt, Christine Derenick-Lopez, Atkinson and Preston responding to an email from Schmidt on the same date. Tipton's email attaches a document

---

[19] The City contends it produced Preston's email recommending Aviles for the Commissioner position, but did not capture the complete March 8, 2016 email chain in response to Pierce's August 8 request because other emails in the chain did not contain the requested search terms. (Def.'s Mem. Opp'n Pl.'s Mot. New Trial 2 n.2.)

Pierce argues that by withholding this email chain, the City prevented her from fully and fairly presenting her case. This argument fails because she was precluded from introducing evidence regarding Carney's appointment under Federal Rule of Evidence 403. *See supra* Section III.B.iii.

tracking the same information as the FY 18 Metrics/FY 19 Goals chart described above. (*Id.*)

- (A) August 21, 2018 email from Schmidt to Marcel Pratt, Preston and Atkinson. The email attaches a "Law Diversity Goals" chart tracking the percentages of White, African American, Latino and Asian exempt employees, executive exempt employees and new hires. (*Id.*)
  (B) August 21, 2018 email from Schmidt to Abernathy, Vanessa Garrett-Harley, Atkinson and Preston. The email attaches a "Public Safety Cabinet Cluster Diversity Goals" chart tracking the same information as the chart described above. (*Id.* at Ex. F.)
  (C) August 23, 2018 email from Schmidt to Fadullon, Preston and Atkinson. The email attaches a "Planning and Development Diversity Goals" chart tracking the same information as the charts described above. (*Id* at Ex. E.)
  (D) August 23, 2018 email from Schmidt to Amy Kurland, Kristy Lieb, Preston and Atkinson. The email attaches an "OIG Diversity Goals" chart tracking the same information as the charts described above. (*Id.*)

Even if Pierce could show by clear and convincing evidence that the City engaged in misconduct when it failed to produce these emails, she cannot establish that she was prevented from fully and fairly presenting her case.[20] Pierce argues that by withholding the emails, the City withheld evidence that it (1) sought to meet a certain percentage of racially diverse employees in its workforce, (2) had specific goals for increasing the percentage of Hispanic employees, but not the percentage of Native American employees, in the workforce, (3) had a specific goal to increase the number of

---

[20] "Failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct." *Stridiron*, 698 F.2d at 207. In a subsequent non-precedential opinion, the Third Circuit Court of Appeals observed that "[w]hether there has been discovery misconduct warranting relief under Rule 60(b)(3) requires not only consideration of the request propounded, but also the response by one's adversary, and whether the moving party resorted to a motion to compel or a request for sanctions as permitted by the federal rules." *Floorgraphics Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 434 F. App'x 109, 112 (3d Cir. 2011). "Consideration of these factors," the court continued, "informs our determination of whether a party was obligated to produce certain evidence during discovery and failed to do so." *Id.*

     There is no question that the City was obligated to produce certain emails and failed to do so. Regardless of whether this failure—which the City describes as an "honest mistake"— constitutes misconduct, *compare Price v. Trans Union, L.L.C.*, 839 F. Supp. 2d 785, 799–802 (E.D. Pa. 2012), *and Sellers v. Gen. Motors Corp.*, 40 Fed. R. Serv. 2d 590 (E.D. Pa. 1984), *with Gethers v. PNC Bank*, 2019 WL 2211117 at *7 (W.D. Pa. May 22, 2019), a new trial is not warranted because Pierce already knew about the City's "Diversity Initiative"; her lawyers just chose not to discuss it at trial.

Hispanic employees in the public safety department, which includes the PDP, (4) expected to fill vacant positions in the public safety department with diverse employees and (5) placed an "extreme level of pressured [sic]" on decisionmakers to hire diverse employees. (Pl.'s Mem. Supp. Mot. New Trial 9–10.)

Pierce asks the Court to believe that she was not aware of the City's "Diversity Initiative"—*i.e.*, its "stated goal of a racially diverse municipal workforce that reflects the demographics of the City's population," *Pierce v. City of Phila.*, 2018 WL 6832093 at *1 (E.D. Pa. Dec. 28, 2018)—before her counsel received these emails from Tomaszewski's lawyers last February. Such a contention is demonstrably false; Pierce herself moved for summary judgment in November of 2018 on the grounds that:

> [t]he City has a policy of considering race in personnel decisions. Consistent with this policy, Defendant seeks to create a workforce that reflects the racial demographics of the city of Philadelphia. In June 2016, the percentage of Hispanic employees in executive level positions in the Department of Prisons was less than the overall Hispanic population in Philadelphia. In an effort to remedy the lack of representation, Defendant sought to fill the vacant HSPA position with a Hispanic individual . . . .

(Pl.'s Mot. Summ. J. 2, ECF No. 32 (internal citations omitted)); *see also* (*id.* at 7 ("[A]s of June 2016 . . . [t]he city was approximately fourteen percent (14%) Hispanic, but only one (1) out of thirty-one (31) executive level employees at the Department of Prisons was Hispanic (less than 3%)." (internal citations omitted)). She argued that the City was "in effect, making a quota" for Hispanic employees. (*Id.* at 6.)

The record evidence at the summary judgment stage included extensive information pertaining to the City's desire to have the City workforce match the ethnicity of the City's residents. In seeking summary judgment, Pierce relied on, among other things, the following documents and deposition testimony:

- September 6, 2017 email from Slusser to Carney, Abernathy, Atkinson and Preston. The email states, in pertinent part, "Developing a diverse workforce that looks like the City of Philadelphia is a key priority for our administration" and includes a list of "feedback from the Office of Diversity & Inclusion" for the PDP:

  > Prisons
  > Total Exempt Employees: 7
  > New Hires: none in July
  > Recruitment forecast: Multiple positions available in FY 18
  > Comment: The department last representation of one or more major Philadelphia demographic groups within its exempt workforce

  Slusser attached the "Office of Diversity & Inclusion Hiring & Attrition Report Guide," which states in pertinent part, "please keep in mind, this is the demographic breakdown for the population Philadelphia [sic]: 44% Black or African American; 35% White; 14% Hispanic or Latino; 7% Asian 3% Two or More Races; 0.80% American Indian or Alaska Native; and 0.10% Native Hawaiian/Other Pacific Islander. . . . While new hires offer us an opportunity to increase diversity, we also want to focus on retention and promotion of diverse employees." (Pl.'s Mot. Summ. J. Ex. K, ECF No. 32.)

- 2016 Philadelphia Workplace Profile Report. The report states in pertinent part, "When he announced the creation of the Office of Diversity and Inclusion, Mayor Kenney stated that the goal of his office is to create a government workforce that looks more like the population of the City. This section serves as a basis to which the Office of Diversity and Inclusion will compare all City of Philadelphia Workforce data." The report lists the percentage of White, Hispanic or Latino, Black or African American, Asian, American Indian or Alaska Native, Two or More Races and Native Hawaiian/Other Pacific Islander citizens of Philadelphia. (Pl.'s Mot. Summ. J. Ex. M.)

- Carney's deposition testimony that "the City of Philadelphia, including the prison, has a policy of creating a workforce that's reflective of the racial demographics of the City of Philadelphia" and that "Mayor Kenney instructed [her] to implement this policy . . . ." (Pl.'s Mot. Summ. J. Ex. E at 38:10–15.)

- Carney's deposition testimony that "as of April of 2016 . . . the percentage of Hispanics in the executive group at the prisons was not reflective of the City's population" because only "one out of 31 [executive-level employees] was Hispanic." (*Id.* at 193:6–23.)

- Abernathy's deposition testimony that the City "want[s] to create an exempt workforce that reflects the demographics of the City" and this

has been the case "throughout the entirety of the Kenney Administration." (Pl.'s Mot. Summ. J. Ex. L at 202:23–203:2, 2-4:8–10.)

- Abernathy's deposition testimony that "[d]iverse employees means non-White employees." (*Id.* at 204:1–3.)

- Abernathy's deposition testimony that the "number of high ranking Hispanics employed by employed by the Department of Prisons was not representative of the City's demographics as a whole." (Pl.'s Mot. Summ. J. Ex. O at 23:14–20.)

The City produced to Pierce in discovery many other documents probative of the

Diversity Initiative:

- 2017 Philadelphia Workforce Diversity Profile Report published by the Office of the Mayor. (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. Ex. X, ECF No. 41.) It states that the "number of Hispanic and Asian employees in the workforce is lower than the Philadelphia population" (without mentioning Native Americans). (*Id.* at CITY 03249.) It continues, "Our analysis found that the City's exempt workforce does not adequately represent Black or African Americans, Hispanic or Latinos, or Asians." (*Id.*) The section of the report that "describes the diversity of the population of the City of Philadelphia" includes the percentage of Black, White, Hispanic and Asian citizens of Philadelphia (again, it does not state the percentage of Native Americans). (*Id.* at CITY 03251.)

- May 8–May 23, 2017 email chain between, *inter alia*, Slusser, Abernathy, Carney, Preston and Atkinson. (Def.'s Resp. Opp'n Mot. New Trial Ex. E.) Slusser states that the City is "providing monthly reports to help track . . . departments' progress towards this important goal [to develop a diverse workforce that looks like the City population]." She continues, "If your numbers do not appear to reflect any improvement, the Office of Diversity & Inclusion will be following up to discuss ways you can improve."

- (A) July 19, 2017 email from Slusser to, *inter alia*, Abernathy, Carney, Preston and Atkinson. (*Id.* at Ex. F.) She states, "[a] huge thank you to the departments who have taken this [Diversity Initiative] on as a priority in their hiring. Without your support, intentionality, and thoughtfulness we would not have made the progress we did in a number of departments. For those who have not seen huge gains this past year, please note that with a new fiscal year comes a fresh start to show improvement in our administration-wide goal of increasing diversity across City government." Carney forwarded this email to Tracy Delaney, Robert Tomaszewski, Greg Vrato and Kathleen McNamara. (*Id.* at Ex. H.)

- Philadelphia Prison System Diversity & Inclusion Check-in chart listing the percentage of Black, White, Hispanic and Asian exempt employees and new hires. (*Id.* at Ex. O.)

- Draft PDP Diversity and Inclusion Plan dated May 2, 2017. (*Id.* at Ex. P.) It includes a chart listing the number of African-American, White, Hispanic and Asian exempt employees in the PDP.

- PDP Applicant Ethnicity Data chart listing the number of Hispanic, Asian, African-American/Black and White applicants for a training administrator position. (*Id.* at Ex. Q.)

Before summary judgment and long before trial, Pierce knew that City had a stated goal to align the percentage of Hispanics in its workforce with the percentage of Hispanic citizens of Philadelphia. The summary judgment record reflected that the City, including the PDP, did not track the percentage of Native American employees the same way it tracked the percentages of African Americans, Hispanics and Asians.[21]

This is not a case in which one party's abuse of the discovery process "effectively foreclosed" the other's ability to present her claim. *See Stridiron*, 698 F.2d at 207. The emails Pierce obtained after trial were, at most, cumulative (albeit even more remote in time from the June, 2016 promotion at the heart of Pierce's lawsuit) of what she already knew. *See Price*, 839 F. Supp. 2d at 800 (denying Rule 60(b)(3) motion where, despite opponent's failure to produce responsive evidence, movant "could have used the substance of [evidence she possessed] to argue the same points she is now pressing upon the Court"). The extraordinary relief Pierce seeks is not justified in these circumstances.

---

[21] Pierce argues in her Motion that by withholding the emails in question, the City prevented her from objecting to defense counsel's statement during closing argument that "As a Native American, the diversity initiative is the exact policy that's intended to benefit [her] . . . ." (Jan. 11, 2019 Hr'g Tr. 65:17–23.) As outlined, Pierce had ample evidence to show that the City, perhaps due to the comparatively higher percentage of these racial and ethnic groups in Philadelphia, focused on certain groups—African Americans, Hispanics and Asians—more than others.

Pierce also argues that without the recently discovered emails, she could not fully and fairly impeach Abernathy and Carney's trial testimony. Specifically, she points to Abernathy's statements that the City "want[s] a diverse pool of applicants in our hiring process, but we will always hire the best person no matter what their racial background is," that diversity does not mean "non-white," that "to his knowledge," the City does not take race into account when making hiring decisions and that the City does not have a diversity "quota system." She points to Carney's statements that race should have played no role in Albandoz's promotion, even if Hispanic employees were underrepresented in the PDP, that "it would be illegal for race to play any part in that decision" and that she does not look at applicants' demographic information before making hiring decisions. *See* (Pl.'s Mem. Supp. Mot. New Trial 11–13).

First of all, the emails' relevance to Pierce's claims is, at best, attenuated. With the exception of Preston's December 12, 2016 email, the emails in question were exchanged roughly two years after Carney's decision to promote Albandoz to the HSPA position. Carney, the person who made the decision to promote Albandoz, did not send or receive any of them. Moreover, the City's Diversity Initiative pertains specifically to exempt employees, executive exempt employees and new hires.[22] Albandoz and Pierce competed for the HSPA job, a civil service position; Albandoz's promotion would not have increased the percentage of Hispanic exempt employees or new hires in the PDP. To the extent Pierce argues that the emails are relevant to her *Monell* claim, she is not

---

[22] The City defines exempt employees as those "not hired through the civil service examinations." (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J. Ex. X at CITY 03257.) Executive exempt employees are those "who earn $90,000 or greater a year." (*Id.* at CITY 03264.)

entitled to a new trial on the issue of municipal liability for the reasons stated in Section III.A.ii, *supra*.

Again, however, Pierce had ample ammunition with which to impeach these witnesses' testimony; much of it is outlined above: documents and testimony describing the City's Diversity Initiative, the City's Hispanic employee percentage goal and Abernathy and Carney's own deposition testimony. *See Floorgraphics Inc.*, 434 F. App'x at 113 (affirming denial of Rule 60(b)(3) motion where, despite opponent's failure to produce responsive evidence, movant still had "ample fuel to fire [its] attack on [a witness's] credibility"). There is nothing Pierce has learned after the trial that prevented her from fully and fairly presenting her case or impeaching either witness's credibility during the proceeding.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.